PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.                                                          No. 06-4850

STANAUS MCCOY,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:06-cr-00208-GBL)

Argued: September 28, 2007

Decided: January 25, 2008

Before WILLIAMS, Chief Judge, GREGORY, Circuit Judge, and
Samuel G. WILSON, United States District Judge for the Western
District of Virginia, sitting by designation.

---

Reversed and remanded by published opinion. Chief Judge Williams
wrote the majority opinion, in which Judge Wilson joined. Judge Wil-
son wrote a separate concurring opinion. Judge Gregory wrote a sepa-
rate dissenting opinion.

---

## COUNSEL

**ARGUED:** Jonathan Leo Fahey, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Vir-
ginia, for Appellant. Todd M. Richman, Assistant Federal Public

Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia, for Appellee. **ON BRIEF:** Chuck Rosenberg, UNITED STATES ATTORNEY, Paul Ahern, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. Michael S. Nachmanoff, Acting Federal Public Defender, Alexandria, Virginia, for Appellee.

---

## OPINION

WILLIAMS, Chief Judge:

The Government in this pending criminal case appeals the district court's order granting Stanaus McCoy's motion to suppress evidence obtained by Loudoun County, Virginia police officers as a result of Officer Paul Loconti's detention and search of McCoy in a grocery store parking lot in Leesburg, Virginia. The district court suppressed the evidence as the fruit of an unlawful seizure, concluding that, under *Terry v. Ohio*, 392 U.S. 1 (1968), Officer Loconti lacked reasonable suspicion to stop and frisk McCoy and thus violated his Fourth Amendment rights in doing so.

We reverse. Considering the totality of the circumstances, as we must, we believe that Officer Loconti possessed a reasonable, articulable suspicion that McCoy was engaged in serious criminality when Loconti stopped and frisked him. As such, no Fourth Amendment violation occurred.

I.

Because McCoy prevailed on his suppression motion, we view the facts in the light most favorable to him. *United States v. Kimbrough*, 477 F.3d 144, 147 (4th Cir. 2007).

A.

According to evidence presented in this case, a good number of illegal drug transactions in Loudoun County occur in grocery store

parking lots. In fact, according to some Loudoun County police officers, nearly half of all the drug deals in Loudoun County occur in public parking lots of grocery stores and other retail stores.

Although these parking-lot drug deals do not all "go down" in identical fashion, they consistently share some common characteristics. Two people usually meet at a prearranged location in a public parking lot; one person gets into the vehicle of the other; the cash-for-drugs transaction occurs; and the individuals go their separate ways. From beginning to end, the typical parking-lot drug deal only takes about one or two minutes.

Drug dealers in the area know that police officers in the area know that public parking lots often are the locale of choice for drug deals, so they employ counter-surveillance techniques in an effort to avoid detection by law enforcement. A common counter-surveillance technique is for the parties to change the location of the drug transaction at the last minute. Parties often agree to meet at a certain location, decide at the last moment to move to a different location for the completion of the transaction, and then meet at the different location to complete the drug deal.

Officer Loconti is well versed in the practices of drug dealers in Loudoun County. A vice narcotics investigator with the Loudoun County Sheriff's Office and an over ten-year veteran of the police force, Loconti has participated in over 100 investigations in which he worked undercover and completed controlled drug purchases, including purchases of crack, powder cocaine, marijuana, LSD, and ecstasy. In addition to his extensive street experience with drug investigations, Loconti has also received formal training in drug surveillance, drug recognition, and the use of drug informants.

Loconti was thus in a familiar setting when, on July 28, 2005, he was staked out in a Safeway grocery-store parking lot in Leesburg, Virginia. At the time, he was conducting surveillance for a controlled drug purchase unrelated to this appeal. Loconti was in plain clothes and in an unmarked patrol vehicle. He had previously been involved in other controlled drug purchases in the very same Safeway parking lot.

Around 6:20 pm, while it was still daylight, Loconti observed a man drive through the Safeway parking lot and park a white Mitsubishi Eclipse in a parking space next to his patrol vehicle. The driver, McCoy, was accompanied by his girlfriend, Christina Thurman. Ms. Thurman was the owner of the Eclipse.

Neither McCoy nor Ms. Thurman exited the vehicle after it was parked. After two or three minutes had passed, a tow truck pulled in front of Loconti's vehicle, in a position close enough to the Eclipse so that the tow-truck driver could communicate with McCoy and/or Ms. Thurman. Loconti heard the tow-truck driver ask McCoy "where he wanted—where they wanted to meet," but he could not hear McCoy's answer. Loconti did, however, observe McCoy respond to the question by pointing in a southerly direction. (J.A. at 77.) In response to McCoy's gesture, the tow truck exited the parking lot and began heading south on King Street, with the Eclipse following closely behind. Loconti found this exchange unusual, and, as the vehicles left the Safeway parking lot, Loconti radioed the other units involved in the controlled drug purchase to let them know that "there may be a drug deal getting ready to happen" and that he "was going to follow these two vehicles to see . . . if anything unfolded." (J.A. at 78.)

Loconti followed the tow truck and Eclipse into a Food Lion parking lot located roughly a quarter mile south of the Safeway parking lot. As with the Safeway parking lot, Loconti had been involved in previous drug busts in the Food Lion parking lot. McCoy and the tow-truck driver parked their vehicles in the right corner of the lot, approximately five to eight parking spaces apart. The parking lot was around half full, and there were numerous available spaces between the store and the places where McCoy and the tow-truck driver decided to park their vehicles. Loconti parked two rows behind the tow truck; from this vantage point, he was able to see the tow-truck driver's head through the truck's back window.

Loconti watched as McCoy got out of the Eclipse and entered the passenger side of the tow truck. Although he could not see much of what was transpiring in the truck, it appeared to Loconti that McCoy and the tow-truck driver were talking. After about a minute, McCoy got out of the truck and began walking back toward the Eclipse. The

tow-truck driver began to drive away, exiting the parking lot onto an adjacent service street. At this point, it was clear to Loconti that the tow-truck driver had not visited the parking lots for the purpose of performing towing services. Loconti's suspicion was particularly aroused because the vehicles "had been to two grocery stores within a quarter mile of each other and no one had gone into a grocery store." (J.A. at 81.)

Loconti believed that "a drug deal had just occurred." (J.A. at 80-81.) He radioed the patrol units back at the Safeway parking lot and exited his vehicle. He began to approach McCoy and, as he was walking toward McCoy, asked to speak with him. McCoy acknowledged Loconti. Loconti then whistled at the tow-truck driver, who at this point had pulled the truck onto the nearby service street, and told him to park the truck. The driver "responded by driving away at a high rate of speed." (J.A. at 314.)

Once Loconti made his way to McCoy, he informed McCoy that he was a police officer and told him to put his hands on the Eclipse so he could frisk McCoy. When McCoy asked Loconti why he wanted to frisk him, Loconti informed McCoy that he believed that McCoy had just completed a drug deal in the tow truck. McCoy put his hands on the trunk of the Eclipse, but after he pulled them away a few times and turned around to speak to Loconti, Loconti placed McCoy in handcuffs and told him that he was being detained. Loconti patted down McCoy and found a pocketknife, after which Loconti directed McCoy to sit down on the curb.

With McCoy handcuffed and seated on the curb, Loconti approached the Eclipse and questioned Ms. Thurman, who had remained in the car through the entire encounter. Thurman stated that she believed McCoy had just engaged in a drug deal. She then consented to a search of the Eclipse and exited the car. Loconti searched the car and found marijuana and cash.

Loconti read McCoy his *Miranda* rights and began to question him. McCoy admitted that he had just completed a drug transaction; that the cash in the glove compartment belonged to him; that the cash constituted drug proceeds; and that he had about $200 worth of crack cocaine concealed in his buttocks. Suffice it to say that, at that point,

Loconti recovered the crack cocaine.[1] The whole encounter — from the time Loconti approached McCoy to the recovery of the crack cocaine — lasted less than 30 minutes.

Based on the evidence obtained by Officer Loconti, and acting pursuant to a search warrant, officers searched McCoy's home on September 16, 2005. McCoy, who was at home at the time, was placed in handcuffs. During the search, the officers discovered other evidence of drug trafficking and firearms. McCoy also made certain inculpatory statements during the search.

## B.

On May 11, 2006, a federal grand jury returned a five-count indictment charging McCoy with two counts of possession with intent to distribute crack cocaine and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C.A. § 841(a)(1) (West 1999); one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C.A. § 924(c)(1) (West 1999 & Supp. 2006); and one count of possession of being a felon in possession of a firearm, in violation of 18 U.S.C.A. §§ 922(g)(1) and 924(e) (West 2000 & Supp. 2006).

McCoy moved to suppress the evidence uncovered by Loconti through his detention and frisk of McCoy in the Food Lion parking lot, arguing that the evidence was "fruit of the poisonous tree" because Loconti lacked the requisite reasonable, articulable suspicion to conduct a *Terry* stop and frisk. He also moved to suppress the evidence recovered through the September 16, 2005 search of his home, including the pre-*Miranda* statements that he made on that occasion, and requested a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).[2]

---

[1]Near the very end of the encounter, another officer arrived and assisted Loconti in seizing the drugs and cash.

[2]In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court recognized a "presumption of validity with respect to the affidavit supporting [a] search warrant," *id.* at 171, and held that a hearing on a motion to test the sufficiency of the affidavit is required only if the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and the offending information was essential to the probable cause determination, *id.* at 155-56.

The district court held a suppression hearing on July 26-27, 2006. The court agreed with McCoy that Loconti's detention and frisk of him violated his Fourth Amendment rights because Loconti lacked a reasonable suspicion to justify a *Terry* stop and frisk. The court thus ordered the suppression of the evidence obtained by Loconti on that night, which included the crack cocaine, marijuana, cash, and McCoy's statements. The court also suppressed the pre-*Miranda* statements McCoy made at his home on September 16, 2005. The court denied McCoy's motion with respect to the other evidence obtained through the September 16, 2005 search of his home and also denied his request for a *Franks* hearing. On October 18, 2006, the court issued a written opinion explaining further its rulings on the suppression motion.

The Government timely appealed the suppression of the evidence obtained by Officer Loconti through the July 28, 2005 stop and frisk of McCoy.[3] We have jurisdiction pursuant to 18 U.S.C.A. § 3731 (West 2000 & Supp. 2006) (granting the courts of appeals jurisdiction over interlocutory appeals by the United States "from a decision or order of a district court suppressing or excluding evidence").

## II.

In reviewing a district court's ruling on a motion to suppress, we review the court's findings of historical fact for clear error, "giving due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We review de novo the ultimate legal conclusion of whether reasonable suspicion existed to justify police action. *Id.*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. These rights are not "second-class rights," *Brinegar v.*

---

[3]McCoy initially argues that we should dismiss this case because the Government has not diligently prosecuted the appeal. This argument is without merit, as the Government fully complied with our briefing schedule.

*United States*, 338 U.S. 160, 180 (1949) (Jackson, J., dissenting), but rather are among the rights held most sacred by the progenitors of the Bill of Rights and most guarded by the common-law tradition. *See Terry*, 392 U.S. at 9.

As is obvious from the constitutional text, the central inquiry under the Fourth Amendment is reasonableness, *id.* at 19, for "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures," *Elkins v. United States*, 364 U.S. 206, 222 (1960). Drawing on the requirement in the second clause of the Fourth Amendment that no warrant may be issued without probable cause, the Supreme Court has laid down the general rule that a search or seizure without probable cause is unreasonable and, thus, unconstitutional. *See Kyllo v. United States*, 533 U.S. 27, 32 (2001) (noting that searches without probable cause are "presumptively unconstitutional"). But this general rule is subject to so many exceptions that one can scarcely call it a "general" rule at all. *See United States v. Chaidez*, 919 F.2d 1193, 1196-97 (7th Cir. 1990) (citing cases and listing a number of exceptions that require less than probable cause, including: administrative searches, inventory searches, school searches, border searches, drug-testing programs, searches incident to arrest, and *Terry* frisks).

Among "the most important of these exceptions, at least from the perspective of law-enforcement-officer safety, is the 'stop-and-frisk' doctrine" that comes from the Supreme Court's decision in *Terry*. *United States v. Holmes*, 376 F.3d 270, 275 (4th Cir. 2004). The *Terry* Court authorized police officers to stop a person who is behaving suspiciously to question him briefly and, if the officers believe the person is armed, to pat down, or "frisk," him for weapons if the officers have a "reasonable suspicion," based on articulable, particularized facts, that "criminal activity may be afoot." *Terry*, 392 U.S. at 30.

"Reasonable suspicion," like any "reasonableness" standard, defies precise definition. Far from being susceptible to a "neat set of legal rules," it is, as the Supreme Court has described, a "commonsense, nontechnical conception[ ] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas*, 517 U.S. at 695-96 (internal quotation marks and citations omitted); *see also United States v. Arvizu*,

534 U.S. 266, 274 (2002) ("Our cases have recognized that the concept of reasonable suspicion is somewhat abstract."). It is thus not surprising that the Supreme Court has often counseled lower courts to give "due weight" to the factual inferences drawn by police officers as they investigate crime, *Arvizu*, 534 U.S. at 273, *Ornelas*, 517 U.S. at 699, *Terry*, 392 U.S. at 27, for the reasonable suspicion analysis is by its nature "officer-centered." *United States v. Perkins*, 363 F.3d 317, 323 (4th Cir. 2004).

A court must look to the totality of the circumstances in determining whether the requisite reasonable suspicion existed for a *Terry* stop and frisk. Whatever the factual context, reasonable suspicion is a less demanding standard than the probable cause standard applied to arrests, *Alabama v. White*, 496 U.S. 325, 330 (1990), falling "considerably short of satisfying a preponderance of the evidence standard," *Arvizu*, 534 U.S. at 274. Requiring a lower quantum of suspicion makes sense because a *Terry* protective stop and frisk — a brief, if not inconsiderable, intrusion on the person — is less intrusive than a traditional full-blown arrest.

Of course, the protections of the Fourth Amendment do not bear on every encounter between a police officer and a member of the public; it is only when a "search" or a "seizure" has occurred that the Fourth Amendment comes into play. *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998) ("The Fourth Amendment covers only 'searches and seizures.'"). If all that is involved is the officer approaching a person, announcing that he is an officer, and asking if the person would be willing to answer some questions, then no reasonable suspicion is required because no "seizure" has occurred. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (plurality opinion). Here, Loconti did not need an articulable suspicion to get out of his patrol vehicle, approach McCoy, inform McCoy that he was an officer, and ask to speak with him. Although many members of the public might feel uncomfortable when an officer approaches them in this manner and asks to speak with them, uncomfortable does not equal unconstitutional.

We therefore must look beyond the point of mere conversation between Officer Loconti and McCoy to determine when the "seizure" occurred that brings us this appeal. *See Ferguson v. City of Charles-*

*ton*, 532 U.S. 67, 92 (2001) (Scalia, J., dissenting) ("The first step in Fourth Amendment analysis is to identify the search or seizure at issue."). There is no doubt that a Fourth Amendment "seizure" occurred once Officer Loconti reached McCoy and told him to put his hands on the trunk of the Eclipse in preparation for a *Terry* frisk. At that point, McCoy's freedom of movement was restrained in such a way that the protections of the Fourth Amendment were triggered. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *Maryland v. Wilson*, 519 U.S. 408, 420 n.8 (1997) (internal quotation marks omitted). With his hands on the trunk of the Eclipse at Loconti's order, McCoy was not going anywhere, and the Fourth Amendment's protections came to bear on the encounter.

So the question is: Did Loconti have a reasonable, articulable suspicion at that point? The district court said no. Although the court recounted what Officer Loconti *had* observed and what he knew at the time he frisked McCoy, it focused its reasonable suspicion analysis on what Loconti *had not* observed and what facts *were not* present. For example, the district court reasoned that "while the Safeway and Food Lion parking lots were known areas of drug activity, they do not qualify as high-crime areas." (J.A. at 325.) The court noted that Loconti did not hear McCoy's conversation with the tow-truck driver; did not observe any furtive movements by McCoy; did not observe a hand-to-hand drug transaction; and did not have any knowledge that McCoy or the tow-truck driver was involved in drugs. The court further noted that McCoy did not try to evade Loconti or flee from the scene. It emphasized that "all Officer Loconti saw," (J.A. at 327), was McCoy signal to a tow-truck driver, lead the tow-truck driver to another grocery store parking lot, and then climb into the tow truck for a brief period of time, and that, in any event, the public parking lot is also "an area where people go to shop." (J.A. at 283.) The court did not recite the precise words from *Terry*, but it is clear enough that it viewed Loconti as having nothing more than an "inchoate and unparticularized suspicion or 'hunch'" that McCoy was engaged in criminality.[4] *Terry*, 392 U.S. at 27.

---

[4]The district court also relied heavily on our decision in *United States v. Sprinkle*, 106 F.3d 613 (4th Cir. 1997), a case in which we held that

The district court was taken by what factual circumstances *did not* exist at the time Officer Loconti detained and frisked McCoy, but when we look at what facts *did* exist in this case, we must reject the district court's conclusion that Officer Loconti's detention and pat down of McCoy were based merely on an inchoate hunch. At the time that Loconti began patting down McCoy, Loconti was aware of the following factual circumstances: (1) nearly 50% of the drug deals in Loudoun County occur in public parking lots; (2) both the Safeway and Food Lion parking lots visited by McCoy and the tow-truck driver were often meeting places for drug deals; (3) drug dealers often engage in counter-surveillance techniques, including changing the location of the drug deal at the last minute; (4) Loconti observed McCoy and his girlfriend drive into the Safeway parking lot and then sit in the car for several minutes; (5) after the tow-truck driver asked McCoy where he wanted to meet, McCoy pointed in a southerly direction; (6) the tow-truck driver and McCoy then traveled from the Safeway parking lot to the Food Lion parking lot approximately a quarter-mile south and did not enter either store; (7) Loconti observed McCoy enter the cab of the tow truck and then exit it after about only a minute; (8) the tow truck performed no towing services and began to leave before Loconti reached McCoy; and (9) when Loconti whistled for the tow-truck driver to stop after the tow truck pulled out of the Food Lion parking lot, the tow-truck driver "responded by driving away at a high rate of speed." (J.A. at 314.) These factual circum-

reasonable suspicion did not exist to justify a *Terry* stop and that the district court found factually analogous to this case. *Id.* at 618-19. We first note that the Supreme Court has observed that because the reasonable-suspicion determination is such a multi-faceted, fact-intensive inquiry, "one determination will seldom be a useful precedent for another." *Ornelas*, 517 U.S. 690, 698 (1996) (internal quotation marks omitted). In any event, *Sprinkle* does not, as the district court apparently thought, command the result reached below. Even a cursory review of *Sprinkle* shows that the case dealt with a very different set of facts than are present here. There, the police officers conducted a *Terry* stop based largely on one officer's knowledge about the criminal history of one of the surveilled individuals and the high-crime nature of the area in which the stop occurred. *Sprinkle*, 106 F.3d at 618-19. This simply is not the case where *Sprinkle* requires a certain conclusion because the facts are so similar to those in that case.

stances closely mirrored the circumstances that Loconti, an over ten-year veteran of the police force and a narcotics detective with special-ized training in drug surveillance, had observed countless times before in public parking lots around Loudoun County and, in fact, had observed before *in the very same Safeway and Food Lion parking lots. See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.")

Under the Supreme Court's decision in *United States v. Sokolow*, 490 U.S. 1 (1989), an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist. *Id.* at 7-11; *United States v. Brugal*, 209 F.3d 353, 361 (4th Cir. 2000) (en banc). *Sokolow* does not require that each of an officer's articulated facts *on its own* eliminate every innocent traveler in order for reasonable suspicion to exist, for reason-able suspicion "does not deal with hard certainties, but with probabili-ties." *Sokolow*, 490 U.S. at 8 (internal quotation marks and citations omitted). It does not even require that an officer's articulated facts, *when taken together*, eliminate every innocent traveler, just a substan-tial portion of them. Rather, *Sokolow* underscores that "*Terry* itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." *Id.* at 9-10 (internal quotation marks and citation omitted). We believe that all of the facts mentioned above that were available to Officer Loconti at the moment of the Fourth Amendment seizure, considered in their totality, eliminated a substantial portion of innocent travelers and made Loconti's suspicion of active criminality reasonable.

Statements by the district court suggest that it viewed what it con-sidered the "innocent" facts here without considering how an experi-enced police officer might approach the same factual circumstances. To give one example, the district court effectively dismissed testi-mony that nearly half of the drug deals in Loudoun County occur in public parking lots because it believed that a parking lot is also "an area where people go to shop." (J.A. at 283.) We perceive two prob-lems with the district court's approach. First, and apart from the issue of Officer Loconti's experience, it is quite clear from the Supreme Court's many precedents in this area that "the relevant inquiry is not

whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Sokolow*, 490 U.S. at 10. As our earlier discussion makes clear, reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation.[5] *Arvizu*, 534 U.S. at 277-78. Indeed, if, as the Supreme Court has stated, "innocent behavior frequently will provide the basis for a showing of probable cause," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983), innocent behavior will frequently provide the basis for reasonable suspicion, a much less demanding standard, all the more.

Second, and no less importantly, the reasonable suspicion determination demands that facts — whether seemingly innocent or obviously incriminating — be assessed in light of their effect on the respective officer's perception of the situation at hand. Although the district court was aware of Officer Loconti's considerable experience, there is no indication that the court gave "due weight" to the inferences drawn by Loconti from the facts he observed in the moments leading up to the *Terry* encounter. Instead, it seems to have substituted its "innocent" take on the facts for Officer Loconti's seasoned perspective. But innocence, like beauty, is in the eye of the beholder, and given the "officer-centered" nature of the reasonable-suspicion inquiry, courts "must give due weight to common sense judgments reached by officers in light of their experience and training" about even seemingly innocent factual circumstances. *Perkins*, 363 F.3d at 321; *see also United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993)(stating that courts are "not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street"). After all, we assess the reasonableness of the *officer*'s actions.

---

[5]We note that not every fact present here might be susceptible to a readily-forthcoming innocent explanation. When Officer Loconti ordered the tow-truck driver to stop after the truck pulled out of the Food Lion parking lot, the driver "responded by driving away at a high rate of speed." (J.A. at 314.) This fact is harder to account for in innocent terms. Although Loconti was in plain clothes and an unmarked vehicle and was not flashing his police badge, it does not always take a police officer's show of force to provoke nervous reactions in a guilty mind, and, as noted throughout the opinion, we must consider the effect the tow-truck driver's actions had on Officer Loconti.

To the layman, two men pacing in front of a store window and periodically peering in the store might suggest that a lady in the store has two bashful admirers. To the street-tested officer, however, the same conduct might suggest that the men are "casing the joint" for a stickup. *Terry*, 392 U.S. at 5-6. Similarly, to the layman, the circumstances of this case *might* admit of some innocent explanation (although we strongly suspect that the average layman, if a fly on the wall for the entire encounter, would have thought McCoy's parking-lot hopping suspicious as well). To Officer Loconti, however, the circumstances strongly suggested that a drug deal was taking place. *See Ornelas*, 517 U.S. at 700 ("To a layman the sort of loose panel below the back seat armrest in the automobile involved in this case may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel."). This difference in perspective is wholly attributable to the difference in day-to-day experiences of laymen and officers like Officer Loconti. One's primary job is to investigate crime; the other's is not. To then decide whether an officer's actions in a given situation were reasonable for Fourth Amendment purposes without affording proper weight to the officer's respective inferences borne out of his experience would be to fail to consider the "totality of the circumstances," as courts must do in conducting the reasonable suspicion analysis. *Arvizu*, 534 U.S. at 275. Moreover, and as noted above, Officer Loconti was not obligated to eliminate every innocent explanation for his suspicion to be reasonable, *see Perkins*, 363 F.3d at 327, and he certainly was not obligated to turn a blind eye to facts that would have seemed suspicious to many people (such as the tow-truck speeding off in response to Loconti's order to the driver to stop).

This is not to say that a wealth of experience will overcome a complete absence of articulable facts, for *Terry* clearly requires that an officer wishing to briefly detain and frisk a person "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Even Sherlock Holmes, living as he does in the pages of fiction where reality is bounded only by imagination, needs some *factual* clues to work his investigative magic. Here, for example, if the question on appeal were whether Officer Loconti had a reasonable suspicion to detain and frisk McCoy after he had only

observed McCoy drive the Eclipse into the Safeway parking lot and remain seated in the vehicle for a few minutes, the answer would certainly be no, for at that point, and no matter how extensive Loconti's experience, there simply were not enough articulable facts to support a *Terry* stop and frisk. Particularized, articulable facts are always required. But neither should federal judges discount seemingly "innocent" factual circumstances simply because they do not possess the seasoned perspective of a police officer, whose eyes and ears have been trained to detect the nefarious in the mundane. We believe the district court did so here and, in so doing, incorrectly concluded that Officer Loconti did not have a reasonable, articulable suspicion to detain and frisk McCoy pursuant to *Terry*.

It would have been "poor police work indeed," *Terry*, 392 U.S. at 23, for an officer of Loconti's experience to fail to investigate further given the numerous facts that strongly suggested, in light of his accrued knowledge of the drug trade, that a drug deal was afoot. The "ultimate test [is] reasonableness under the Fourth Amendment," *Royer*, 460 U.S. at 499, and we cannot say, in light of *Terry*, that Officer Loconti's actions here were unreasonable in any sense.

### III.

*Terry* reflects a careful but common sense balancing of the competing Fourth Amendment interests of the individual in being left alone by the police and the community (and by extension, the police) in investigating and preventing crime. Officer Loconti's investigative efforts in this case did not upset that balance. This is not a case of governmental overreaching, nor is it a case of a "hunch" gone right. It is a case of an experienced police officer dutifully investigating and uncovering criminality well within the bounds of *Terry*.

Accordingly, because we conclude that Officer Loconti had the requisite reasonable suspicion under *Terry* to briefly detain and frisk McCoy, we reverse that part of the district court's order granting McCoy's motion to suppress the evidence obtained as a result of the *Terry* encounter and remand for proceedings consistent with this opinion.

*REVERSED AND REMANDED*

WILSON, District Judge, concurring:

I join in the majority opinion based on a fact found by the district court but undervalued in the dissenting opinion, an objective fact which, in my view, taken together with the facts that preceded it, culminated in reasonable, articulable suspicion justifying a limited *Terry* stop. Officer Loconti approached McCoy after McCoy exited the tow truck; Loconti signaled the tow truck driver in an effort to gain his attention, and, in the words of the district court, the tow truck "driver *responded* by driving away at a high rate of speed." (emphasis added). (J.A. at 314.) Although Loconti was not in uniform, I believe it was objectively reasonable in light of all the facts that preceded it for Officer Loconti to view the tow truck driver's flight to be highly suspicious — not confirming guilty conduct, but warranting further investigation. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion. . . . Headlong flight — wherever it occurs — is the consummate act of evasion . . . ."); *United States v. Smith*, 396 F.3d 579, 584-5 (4th Cir. 2004). At that moment, the facts in their totality served to eliminate a substantial portion of innocent travelers and justified a limited *Terry* stop of McCoy. Therefore, I join in the majority opinion based on objective facts supporting the officer's subjective beliefs.*

---

*I think it especially important to give appropriate deference to findings of historical fact made by resident judges. On that score, the majority opinion does not countermand a single finding of historical fact. It does, however, follow two clear commands of the Supreme Court. First, it follows the command to determine reasonable suspicion *de novo*. In contrast to findings of historical fact, "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). Second, the majority opinion follows the Supreme Court's command that courts are not to view facts through the lens of guilt or innocence, but rather through the lens of probabilities. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The dissent suggests the facts here are innocent, but *Terry* itself illustrates, as the majority opinion notes, that the conduct justifying a stop may be entirely lawful. It is well-established that lawful but evasive, suggestive behavior justifies a stop so that an officer can "resolve the ambiguity." *Wardlow*, 528 U.S. at 125. Officer Loconti made a fact-based, common-sense judgment that the conduct he observed was suspicious.

GREGORY, Circuit Judge, dissenting:

The issue is whether Officer Loconti had a "reasonable suspicion" to stop McCoy. *Terry v. Ohio*, 392 U.S. 1 (1968), provides police officers with a *limited* exception to the warrant and probable cause requirements of the Fourth Amendment when there is reasonable suspicion supported by articulable facts that criminal activity is afoot — not a general warrant to hunt out the "nefarious in the mundane" based on hunches, intuition, or stereotypes. *Id.* at 30; *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989). Viewing innocuous facts through the lens of Officer Loconti's "seasoned perspective," *see* Maj. Op. 13, the majority opinion exploits subjective experience to trump an otherwise absence of reasonable suspicion. Today's holding renders law enforcement — not the courts — the sole arbiter of what qualifies as reasonable suspicion. By failing to recognize that Officer Loconti (who dwells not "in the pages of fiction where reality is bounded only by the imagination," Maj. Op. 14) is restricted by words (the United States Constitution) far more riveting than those found in any novel, the majority obliterates the Fourth Amendment's protections. Thus, I respectfully dissent.

The test for reasonable suspicion is objective. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The subjective beliefs of any one officer — even a "seasoned officer" — does not and cannot overcome the objective, reasonable, and articulable factual inferences drawn by a court. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996) (stating that "a reviewing court should take care both to review findings of historical fact for clear error and to give due weight to inferences drawn from those facts by *resident judges* and local law enforcement officers") (emphasis added).[1] While the majority criticizes the district court's decision to focus on what did not happen, a careful reading of what did occur reveals only two individuals having a conversation in broad daylight, following each other from one public location to another, and continuing their conversation.

---

[1]To be clear, I do not suggest that the district court's determination of reasonable suspicion is not subject to *de novo* review. Rather, I believe that the majority, while taking into account inferences drawn by Officer Loconti, fails to give due weight to the inferences drawn by the district court in determining that reasonable suspicion did not exist.

Unlike the hundreds of *Terry* stops we have affirmed, McCoy did nothing more than communicate and associate in a public place. The district court correctly found that: (1) McCoy's actions occurred in broad daylight in public grocery store parking lots during business hours; (2) the grocery store parking lots were *not* high-crime areas; (3) Officer Loconti *did not* hear McCoy's conversation with the tow truck driver; (4) Officer Loconti *did not* witness McCoy make any furtive movements, including any hand-to-hand transaction with the tow-truck driver; and (5) McCoy *did not* try to avoid Officer Loconti or flee the scene.[2] (J.A. 325, 327.); *cf. United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1997) (noting that when officers tried to approach the suspect, he evaded them by turning his back and walking away); *United States v. Mayo*, 361 F.3d 802 (4th Cir. 2004) (finding the defendant's unusual nervousness and the appearance of something heavy in his pocket were articulable bases for reasonable suspicion); *United States v. Perkins*, 363 F.3d 317 (4th Cir. 2004) (finding reasonable suspicion where suspect fits description of informant tip). The district court concluded, in light of these factors, that Officer Loconti's observations were insufficient to form reasonable suspicion. I agree. Taking an objective view of Officer Loconti's observations, as we must, McCoy's conduct does not eliminate a substantial portion of innocent ordinary activity. *United States v. Brugal*, 209 F.3d 353, 361 (en banc) (plurality opinion); *see also United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) (noting that suspicious behavior may give an officer the impression that a narcotics transaction is occurring, but more is needed to qualify for reasonable suspicion). Yet the majority's holding is so broad that it encompasses such seemingly innocent and ordinary behavior.

---

[2]Although the district court found that the tow truck driver fled "at a high rate of speed," this fact does not bolster the majority's position. Officer Loconti testified that when he called out to McCoy and indicated that he wanted to talk; McCoy stopped. (J.A. 82.) Further, Officer Loconti testified that he believed he witnessed a drug deal and stopped McCoy before whistling to the tow truck driver. (J.A. 81, 82.) Thus, to impute the tow truck driver's evasive behavior to McCoy would be particularly disconcerting because McCoy took no evasive action when summoned by Officer Loconti and was already stopped prior to the tow truck driver fleeing.

The fact that drug deals previously occurred in both parking lots is inconsequential. As our Circuit has explained, an officer spotting a person in a high crime area does not provide independent or free-standing grounds for reasonable suspicion. *Sprinkle*, 106 F.3d at 617 (citing *Brown v. Texas*, 443 U.S. 47 (1979)). To consider the illegal propensities of an area as an independent corroborating factor in the reasonable suspicion analysis "would, in effect, hold[ ] a suspect accountable for factors wholly outside of his control." *United States v. Perrin*, 45 F.3d 869, 873 (4th Cir. 1995). Likewise, to find reasonable suspicion based on Officer Loconti's reflexive profile of drug transactions in Loudoun County, Virginia, would upend constitutional requirements. Even when a defendant is a known drug dealer, we have held that more is required to create reasonable suspicion. *Sprinkle*, 106 F.3d at 617 (citing *United States v. Davis*, 94 F.3d 1465, 1469 (10th Cir. 1996)). We have, here, only two unknown individuals conversing and following each other from one grocery store parking lot to another.

Law enforcement officers are suspicious by training, but the broad reach of their suspicion is constrained by the Court's objective analysis of reasonableness. By justifying the existence of both suspicion and reasonableness solely on Officer Loconti's "seasoned perspective," the majority abdicates that role. Officer Loconti's subjective opinion may very well be that McCoy's behavior was indicative of a drug deal. Frankly, however, the law is clear that Officer Loconti's subjective opinion — without *more* — cannot objectively support reasonable suspicion. *See United States v. Jones*, 990 F.2d 405, 408 (8th Cir. 1993) ("Because we decide whether reasonable suspicion justifies a detention based on all the objective facts, we are not limited by the detaining officer's subjective opinions."). The facts known to him at the time of McCoy's seizure, viewed in a light most favorable to McCoy, reflect no more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27. A "hunch" is not reasonable suspicion and, therefore, cannot justify a search under the Fourth Amendment. Officer Loconti had nothing more than a hunch, to which the majority in error gives dispositive weight.

While constitutional interpretation is not an exact science, it is certainly not left solely, as the majority does here, to law enforcement's subjective opinions. Beauty very well may be "in the eye of the

beholder," to use the majority's words, but one's constitutional rights are not left to such whim. The district court rightly understood this important distinction. Because the majority does not, and — in the process — diminishes the rights of all citizens "to be secure in their persons," U.S. Const. amend. IV, I must respectfully dissent.