COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Humphreys and Senior Judge Coleman
Argued at Chesapeake, Virginia


MICHAEL CARNELL PERRY, A/K/A
   MICHAEL CORNELL PERRY
                                                MEMORANDUM OPINION[*] BY
v.        Record No. 2553-09-1              JUDGE SAM W. COLEMAN III
                                                     OCTOBER 19, 2010
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                            Joseph A. Leafe, Judge

              (Daymen W. X. Robinson, on brief), for appellant.  Appellant
              submitting on brief.

              Kathleen B. Martin, Senior Assistant Attorney General (Kenneth T.
              Cuccinelli, II, Attorney General, on brief), for appellee.


        Michael C. Perry, appellant, was convicted of possession of cocaine with the intent to

distribute and possession of a firearm while in possession of cocaine with the intent to distribute.

On appeal, he maintains the trial court erred in denying his motion to suppress the admission of

narcotics seized from his car following a drug dog's alert.  He contends his detention while

awaiting the arrival of the drug dog violated the Fourth Amendment.  Because we conclude

appellant's brief detention was based upon a reasonable suspicion of criminal activity, we affirm

the trial court's decision.

                                        BACKGROUND

        We consider the evidence in the light most favorable to the Commonwealth, as the

prevailing party below, and grant to the Commonwealth all reasonable inferences fairly

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

deducible from the evidence. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991).

On March 28, 2008, at approximately 10:40 a.m., Officer Robert Dickason observed a man running from a convenience store to a vehicle parked across the street. Dickason, who had nearly sixteen years' experience with the Vice and Narcotics Unit, had made numerous drug arrests in the vicinity of the convenience store and knew "a lot of narcotic dealing" took place there both day and night. Dickason's attention was drawn to the man, later identified as Andre Chappell, because in Dickason's experience, drug deals were often accomplished by "runners" moving back and forth between different vehicles. As Dickason drove by, he saw Chappell enter the passenger side of a parked Expedition. Perry was sitting in the driver's seat.

Both men "followed" Dickason with their eyes, but made no other movements. Dickason turned the corner and returned to Perry's vehicle, parking one space away from the passenger side. As Dickason parked his car, Chappell exited Perry's vehicle. Dickason approached Chappell and asked him for identification. In response, Chappell "started to get a little nervous and his hands were shaking." Chappell reached into his pants pocket and pulled out a paper and a baggie of suspected cocaine and threw them to the ground. Dickason arrested Chappell and searched him, recovering a second bag of cocaine. Dickason's interactions with Chappell were within "plain sight" of Perry.

After Dickason placed Chappell in the back of his cruiser, Perry exited his vehicle and approached the passenger side of the Expedition. Perry asked, "What's going on with my uncle? Whatever he had didn't have anything to do with me." Perry asked this question "a few times."

Dickason asked Perry for identification, and Perry complied. Perry was "very compliant," "very calm and very polite," during his encounter with Dickason, and Dickason did not search him or handcuff him. However, in Dickason's experience, the discovery of drugs on

- 2 -

an individual in "proximity" to another individual often signified a recent drug transaction between the two. Accordingly, as Dickason used Perry's identification to fill out a field interview card, he called for another unit and a drug dog. Upon completing the card, Dickason informed Perry he was "going to be detained for police investigation since [Dickason] ha[d] already arrested his supposed uncle for cocaine."

A few minutes[1] later, Investigator Cannant arrived with a drug dog. The drug dog immediately alerted to the driver's side of the vehicle. Upon searching the car, police found a gun and narcotics in the console and arrested Perry.

ANALYSIS

"In reviewing a trial court's denial of a motion to suppress, '[t]he burden is upon [the defendant] to show that th[e] ruling, when the evidence is considered most favorably to the Commonwealth, constituted reversible error.'" McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (citation omitted). While we review *de novo* questions of law and the "trial court's application of defined legal standards to the particular facts of a case[,]" Watts v. Commonwealth, 38 Va. App. 206, 213, 562 S.E.2d 699, 701 (2002), "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or 'without evidence to support them,'" McGee, 25 Va. App. at 198, 487 S.E.2d at 261.

Citing United States v. Cortez, 449 U.S. 411, 417-18 (1981), Perry argues his detention while awaiting the drug dog, and the search of his vehicle following the drug dog's alert, violated the Fourth Amendment because Dickason did not have a "particularized and objective basis" to suspect he was engaged in criminal activity. He points out he made no movements and took no actions supporting a reasonable suspicion of wrongdoing.

---

[1] Dickason estimated "between five to ten minutes" elapsed between the time he initially approached Perry's vehicle and the arrival of the drug dog.

"Fourth Amendment jurisprudence recognizes three categories of police-citizen confrontations[.]" Sykes v. Commonwealth, 37 Va. App. 262, 267, 556 S.E.2d 794, 796 (2001).

> First, there are consensual encounters which do not implicate the Fourth Amendment. Next, there are brief investigatory stops, commonly referred to as "Terry" stops, which must be based upon reasonable, articulable suspicion that criminal activity is or may be afoot. Finally, there are "highly intrusive, full scale arrests" or searches which must be based upon probable cause to believe that a crime has been committed by the suspect.

McGee, 25 Va. App. at 198, 487 S.E.2d at 261 (citations omitted). By detaining Perry, Dickason "effected a seizure for Fourth Amendment purposes." See Lawson v. Commonwealth, 55 Va. App. 549, 554, 687 S.E.2d 94, 96 (2010). Accordingly, Perry's detention had to be "supported at least by a reasonable articulable suspicion that [he] [wa]s engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980).

> "Reasonable suspicion," like any "reasonableness" standard, defies precise definition. Far from being susceptible to a "neat set of legal rules," it is, as the Supreme Court has described, a "commonsense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695-96 (1996) (internal quotation marks and citations omitted); see also United States v. Arvizu, 534 U.S. 266, 274 (2002) ("Our cases have recognized that the concept of reasonable suspicion is somewhat abstract."). It is thus not surprising that the Supreme Court has often counseled lower courts to give "due weight" to the factual inferences drawn by police officers as they investigate crime, Arvizu, 534 U.S. at 273, Ornelas, 517 U.S. at 699, Terry [v. Ohio], 392 U.S. [1], 27 [(1968)], for the reasonable suspicion analysis is by its nature "officer-centered." United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004).

United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008).

To justify his detention of Perry, Dickason must have had "a reasonable suspicion supported by articulable facts that criminal activity may be afoot," but "[a]ctual proof that

- 4 -

criminal activity [wa]s afoot [wa]s not necessary." Lawson, 55 Va. App. at 554, 687 S.E.2d at 96 (citations and internal quotation marks omitted).

> A reasonable suspicion justifying an investigatory stop is "something more than an inchoate and unparticularized suspicion or 'hunch' of criminal activity," but "something less than probable cause." Jackson [v. Commonwealth], 267 Va. [666,] 673, 594 S.E.2d [595,] 598 [(2004)] (quoting Terry, 392 U.S. at 27) (some internal quotation marks and other citations omitted). If a police officer is so justified in stopping a suspect, "the officer may detain the suspect to conduct a brief investigation without violating the person's Fourth Amendment protection against unreasonable searches and seizures." McGee, 25 Va. App. at 202, 487 S.E.2d at 263. In determining whether such justification for an investigatory stop has been established, "the courts must consider the totality of the circumstances--the whole picture." Shiflett [v. Commonwealth], 47 Va. App. [141,] 146, 622 S.E.2d [758,] 761 [(2005)] (citations and internal quotation marks omitted).

Id. at 555, 687 S.E.2d at 97. As we consider "the whole picture," our assessment of reasonable suspicion must be based on "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' Scott v. United States, 436 U.S. 128, 136 (1978), and not on [his] actual state of mind at the time the challenged action was taken." Maryland v. Macon, 472 U.S. 463, 470-71 (1985) (citing Scott, 436 U.S. at 138, 139 n.13). See also Lawson, 55 Va. App. at 558, 687 S.E.2d at 98.

The Commonwealth argues that, based upon the totality of the circumstances, Dickason could reasonably infer that Perry may have been engaged in a drug transaction with Chappell. In support of this argument, the Commonwealth notes that Perry was in a high-drug area, and as Dickason knew, an area where narcotics transactions were often conducted by individuals running between vehicles. The Commonwealth also cites Dickason's testimony that, in his sixteen years of experience with narcotics offenses, when he found drugs on one person, "more than likely they're going to be with another person in proximity of them, or there was . . . going to be some selling or buying going on between the two."

Giving "'due weight to common sense judgments reached by officers in light of their experience and training'" may justify a <u>Terry</u> stop when the factual circumstances are "seemingly innocent" to a layperson lacking such background.  <u>McCoy</u>, 513 F.3d at 414 (quoting <u>United States v. Perkins</u>, 363 F.3d 317, 321 (2004)).  For example, in <u>Terry</u>, 392 U.S. 1, "two men pacing in front of a store window and periodically peering in the store" could appear completely innocent to a passerby, but could nevertheless cause a seasoned police officer to reasonably suspect the men were "casing the joint" without running afoul of the Fourth Amendment.  <u>McCoy</u>, 513 F.3d at 414 (citing <u>Terry</u>, 392 U.S. at 5-6).

> This difference in perspective is wholly attributable to the difference in day-to-day experiences of laymen and officers . . . . One's primary job is to investigate crime; the other's is not.  To then decide whether an officer's actions in a given situation were reasonable for Fourth Amendment purposes without affording proper weight to the officer's respective inferences borne out of his experience would be to fail to consider the "totality of the circumstances," as courts must do in conducting the reasonable suspicion analysis.

<u>Id.</u> at 414-15 (citation omitted).

Accordingly, in <u>McCoy</u>, the United States Court of Appeals for the Fourth Circuit relied heavily on the officer's experience with drug transactions in upholding his decision to detain a suspected participant in a drug transaction.  Like Dickason, Officer Loconti was an experienced narcotics investigator.  He had made numerous arrests in grocery store parking lots, and had arranged several controlled drug purchases in the parking lot where he first observed McCoy.  In Loconti's experience, while not all drug deals in the area were identical, they typically involved two people meeting in a public parking lot, with one person entering another individual's vehicle, and following a brief "cash-for-drugs transaction," the individuals leaving the scene.  <u>Id.</u> at 407.  Loconti was also aware that, in an effort to avoid detection, the buyer and seller often changed the location of the transaction at the last minute.

Armed with this knowledge, Loconti observed a tow truck pull alongside McCoy's car briefly in a grocery store parking lot and overheard the driver ask McCoy "where he wanted to meet." Id. After McCoy gestured in a particular direction, the tow truck left the parking lot with McCoy's vehicle following closely behind. Suspicious, Loconti followed the vehicles and radioed other officers in the area that "there may be a drug deal getting ready to happen." Id. at 408. After the two vehicles parked in another grocery store parking lot, McCoy exited his vehicle and got into the truck. Approximately one minute later, McCoy got out of the truck and began walking back to his car. Loconti immediately radioed nearby officers and exited his vehicle. Id. As he approached McCoy, the tow truck began to pull out of the parking lot, prompting Loconti to blow his whistle and order the driver to park the truck. The driver immediately left the scene "at a high rate of speed." Id.

Loconti handcuffed McCoy and informed him he was being detained. Id. After obtaining consent to search McCoy's vehicle, Loconti recovered marijuana and cash from the car and began to question McCoy. McCoy admitted the cash was his, that he had just completed a drug transaction, and that he was concealing $200 of crack cocaine in his buttocks. Id. at 409.

Based on the circumstances presented to Loconti and giving "due weight" to his experience in drug transactions, the United States Court of Appeals for the Fourth Circuit not only concluded McCoy's detention was justified under the Fourth Amendment, but further observed that

> [i]t would have been "poor police work indeed," Terry, 392 U.S. at 23, for an officer of Loconti's experience to fail to investigate further given the numerous facts that strongly suggested, in light of his accrued knowledge of the drug trade, that a drug deal was afoot. The "ultimate test [is] reasonableness under the Fourth Amendment," [Florida v.] Royer, 460 U.S. [491,] 499 [(1983)], and we cannot say, in light of Terry, that Officer Loconti's actions here were unreasonable in any sense.

Id. at 415.

"[T]he reasonable suspicion determination demands that facts--whether seemingly innocent or obviously incriminating--be assessed in light of their effect on the respective officer's perception of the situation at hand." Id. at 414. Here, Dickason was very familiar with the area around the convenience store where he detained Perry, having "worked [in] that area predominantly [his] whole career." He had made "numerous arrests" in that area of town and knew it contained a "a lot of drugs, a lot of guns." Dickason, who also knew that drug deals were often transacted in that area by "runners" moving between vehicles, became suspicious when he observed Chappell running from the convenience store to Perry's car. Dickason's suspicions deepened when he observed appellant and Chappell watching him, prompting Dickason to investigate.

When Chappell exited Perry's vehicle at Dickason's approach and dropped a baggie of cocaine, Dickason's original suspicions were confirmed with respect to Chappell. With respect to Perry, however, Dickason's original suspicions were not only unresolved, but based upon his experience in narcotics transactions, were also heightened due to Chappell's proximity to Perry. Therefore, he detained Perry for a few minutes to further investigate the scene with a drug dog.

> Under the Supreme Court's decision in United States v. Sokolow, 490 U.S. 1 (1989), an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist. Sokolow does not require that each of an officer's articulated facts on its own eliminate every innocent traveler in order for reasonable suspicion to exist, for reasonable suspicion "does not deal with hard certainties, but with probabilities." Sokolow, 490 U.S. at 8 (internal quotation marks and citations omitted). It does not even require that an officer's articulated facts, *when taken together*, eliminate every innocent traveler, just a substantial portion of them. Rather, Sokolow underscores that "Terry itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." Id. at 9-10 (internal quotation marks and citation omitted).

McCoy, 513 F.3d at 413 (some citations omitted).

Had Perry merely been sitting in his car in an area known for frequent drug transactions often conducted by "runners," and Dickason had observed Chappell running to a nearby car, Dickason could not have justified Perry's detention, regardless of Dickason's prior experience in the area.  See Rudolph v. Commonwealth, 277 Va. 209, 210, ___ S.E.2d ___, ___ (fact that a Terry stop occurred in a "high crime area" is "insufficient to supply a particularized and objective basis for suspecting criminal activity on the part of the particular person stopped"), cert. denied, 130 S. Ct. 738 (2009).  Here, however, because Chappell ran to *Perry's* car, Dickason's suspicions were specifically and reasonably directed toward Perry.  If Dickason's suspicions were insufficient to warrant a Terry stop at that time, they clearly warranted Perry's detention when Chappell emerged from Perry's car with two packages of cocaine.  To have walked away from the scene after Chappell discarded the cocaine without further investigating whether the driver of the car might be involved "would have been poor police work indeed."  Terry, 392 U.S. at 23.

Accordingly, we affirm the trial court's denial of the motion to suppress.

Affirmed.