PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.                                        No. 08-5030

BOBBY LEE MEDFORD,

  *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
T. S. Ellis, III, Senior District Judge, sitting by designation.
(1:07-cr-00122-TSE-1)

Argued: September 22, 2011

Decided: November 7, 2011

Before TRAXLER, Chief Judge, KEENAN, Circuit Judge,
and HAMILTON, Senior Circuit Judge.

Affirmed by published opinion. Judge Keenan wrote the opinion, in which Chief Judge Traxler and Senior Judge Hamilton joined.

## COUNSEL

**ARGUED:** William Robert Terpening, ANDERSON TERPENING, PLLC, Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES

ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Anne M. Tompkins, United States Attorney, Charlotte, North Carolina, for Appellee.

---

# OPINION

KEENAN, Circuit Judge:

Bobby Lee Medford, a former Sheriff of Buncombe County, North Carolina, was convicted in a jury trial of numerous conspiracy and other charges relating to his receipt of bribes in connection with the unlawful operation of video poker machines in Buncombe and other North Carolina counties. Medford raises several challenges to his convictions, including the district court's refusal to sever his trial from that of a co-defendant, the district court's admission of a tape-recorded conversation into evidence containing statements of certain alleged participants in the bribery scheme, and various other issues. Upon our review, we affirm Medford's convictions on all counts.

## I.

Medford served as the Sheriff of Buncombe County, North Carolina, from 1994 through 2006, when he lost his bid for re-election. Under a state law enacted in 2000 (the 2000 legislation), Medford was required, among his other duties as Sheriff, to enforce North Carolina's newly-enacted regulations governing video poker machines. *See* N.C.G.S. § 14-306.1 (2000).

Under the 2000 legislation, which was repealed in 2007,[1] an establishment was permitted to have up to three video

---

[1]Effective July 2007, the operation of any type of video poker machine permitted under the 2000 legislation is now illegal. *See* 2006 N.C. Sess. Laws ch.6, §§ 3, 4; N.C.G.S. § 14-306.1A (2007).

poker machines at one store location. Although cash payouts from the poker machines were prohibited under the 2000 legislation, "winnings" from a poker machine could include up to eight "replays" on the machine or a coupon for merchandise not exceeding a value of ten dollars. Each video poker machine in operation was required to be registered with the sheriff's office in the county in which the machine was located.

Once registered, the video poker machines were affixed with registration stickers bearing a unique identification number. Sheriffs were not permitted to charge any fee in connection with the registration of the video poker machines. The 2000 legislation also prohibited the importation into North Carolina of any additional video poker machines, thereby restricting the "pool" of available video poker machines to those machines already located in the state.

In 2001, Medford delegated the primary responsibility for registering video poker machines to Lieutenant John Harrison. Medford assigned Guy Kenneth Penland, a volunteer who held himself out as a "Captain" in the Buncombe County Sheriff's Office, to assist Harrison. When Harrison retired in May 2005, Lieutenant Ronnie "Butch" Davis took over the duty of registering the video poker machines, and continued doing so until Medford lost his bid for re-election and left office in December 2006.

The evidence at trial established that Medford, with the assistance of Harrison, Penland, and Davis (collectively, the co-conspirators), accepted cash payments from the operators of video poker machines (operators) and owners of establishments (store owners) in which the video poker machines were located.[2] In exchange for these cash payments, Medford

---

[2]Generally, the video poker machine "operators" owned the machines, and placed the machines in convenience stores or other businesses, agreeing to share the proceeds with the store owners. While there were a few operators who owned the stores in which the machines were placed, the great majority of the store owners were not also operators.

allowed certain of the video poker machines to be registered and operated in ways that violated the restrictions established in the 2000 legislation.

According to the testimony of Harrison and numerous video poker machine operators and store owners, Medford and his co-conspirators were paid cash bribes to register video poker machines, some of which had been brought in from other states in violation of the 2000 legislation. Medford and his co-conspirators also received cash bribes to place video poker machines in particular stores, and to allow the operation of video poker machines that on occasion paid out large sums of cash.

Additionally, Harrison, with Medford's knowledge and consent, organized semi-annual golf tournaments, with participating individuals and organizations paying a "donation" to participate or to "sponsor" a golf hole. Soon after the 2000 legislation was enacted, the majority of the individuals and organizations financially supporting the tournament were video poker machine operators and store owners.

During election years, the proceeds from the golf tournaments were used to support Medford's re-election campaigns. However, during non-election years, the proceeds were sometimes distributed either directly to Medford or deposited, at Medford's direction, into credit union accounts held by Medford or his girlfriend. Although most of the money received in connection with the golf tournaments was in the form of cash, checks were sometimes given and were cashed by members of the Sheriff's Department in stores in which video poker machines were located.

On one particular occasion, at Medford's direction, Sheriff's Department employees converted cash obtained during a golf tournament into money orders. Medford instructed that the money orders be purchased at different post offices in order to keep the purchases under a certain amount, thereby

avoiding federal reporting requirements applicable to larger cash purchases.

The record also shows that Henderson Amusement, Inc. (Henderson Amusement), a video poker machine operator based in South Carolina, registered 122 video poker machines in Buncombe County and numerous machines in other North Carolina counties. Henderson Amusement was a frequent provider of cash bribes to Medford and his co-conspirators.

Jerry Pennington, an employee of Henderson Amusement, worked with Penland to register video poker machines that previously had been in use outside North Carolina. Penland brought Pennington to various stores, and placed pressure on the store owners to install the machines in these locations. In return, Pennington paid Penland a commission for every machine that Penland was able to put into operation.

In addition to these commission payments, Pennington, on behalf of Henderson Amusement, regularly made cash payments to Medford, Penland, and the other co-conspirators. Pennington made at least seven such payments directly to Medford, in individual amounts up to $2,500. In total, Henderson Amusement's expense reports showed that the company paid $152,516.43 to individuals associated with the Buncombe County Sheriff's Department, with Medford personally receiving $32,000.

On the basis of this and other evidence, a grand jury indicted Medford, along with Harrison, Penland, and Davis, on charges of: conspiracy to commit extortion under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951 (Count One); conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (Count Two); five counts of mail fraud and aiding and abetting mail fraud, in violation of 18 U.S.C. §§ 1341, 1346 (Counts Three through Seven); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Eight); conspiracy to obstruct the enforce-

ment of criminal laws, with the intent to facilitate an illegal gambling business, in violation of 18 U.S.C. § 1511 (Count Ten); and conspiracy to conduct an illegal gambling business, in violation of 18 U.S.C. § 371 (Count Eleven).[3]

The charges against Medford and Penland were tried together, over their objection, in an eleven-day jury trial. The jury returned a verdict of guilty against Medford and Penland on all counts. The district court sentenced Medford to concurrent terms of imprisonment of 180 months for each of his convictions on Counts 1 through 8, and concurrent terms of imprisonment of 60 months for each of his convictions on Counts 10 and 11. Medford timely filed a notice of appeal.

## II.

Medford raises five challenges in this appeal. He asserts that: 1) the district court erred in admitting into evidence a recording of a meeting that occurred between representatives of Henderson Amusement and persons associated with a sheriff's department of a county adjacent to Buncombe County; 2) the district court abused its discretion in denying Medford's motion to sever his trial from Penland's trial; 3) the evidence was insufficient to support Medford's conviction for violating the Hobbs Act; 4) the district court deprived Medford of a fair trial by subjecting him to inconsistent and biased treatment; and 5) the Honest Services Fraud statute, 18 U.S.C. § 1346, on which the charges in Counts Three through Seven were based, is unconstitutionally vague. We address each argument in turn.

## A.

Medford first argues that the district court erred in admit-

---

[3]The grand jury also indicted Davis for making false statements (Count Nine), but neither Medford nor the other co-conspirators were charged with this offense.

ting into evidence a recording of a December 19, 2006 meeting (the December 19 meeting) attended by Jamie Henderson, a co-owner of Henderson Amusement, Jeff Childers, an employee of Henderson Amusement, John Parker, a former deputy sheriff in neighboring Rutherford County, and Jack Conner, the newly-elected Sheriff of Rutherford County. According to Medford, this recording should not have been admitted into evidence because the recording related to a separate conspiracy in Rutherford County to which Medford was not a party, and occurred after Medford already had left office following his loss in the 2006 election. Thus, Medford asserts that the recording did not qualify for admission under the hearsay exclusion provided by Rule 801 for statements made by co-conspirators during the course and in furtherance of a conspiracy.[4] *See* Fed. R. Evid. 801(d)(2)(E).

The record shows that neither Medford nor any of the co-conspirators named in Medford's indictment attended the December 19 meeting, which was recorded by Parker and Conner in cooperation with the Federal Bureau of Investigation (FBI). The meeting occurred more than two weeks after Medford had left his position as Sheriff of Buncombe County. During the meeting, as reflected in the transcript of the recording, Henderson informed Conner that Henderson Amusement had placed video poker machines in twelve counties in North Carolina, including about 150 machines located in Buncombe County.

Henderson also stated in the recorded conversation that the Buncombe County Sheriff's Department did not "mess with"

---

[4]Fed. R. Evid. 801(d)(2)(E) provides, in relevant part, that "[a] statement is not hearsay if—. . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In order for a statement to be admissible under Rule 801(d)(2)(E), there must be evidence (1) that there was a conspiracy between the declarant and the non-offering party; and (2) that the statement was made during the course and in furtherance of that conspiracy. *United States v. Ayala*, 601 F.3d 256, 267-68 (4th Cir. 2010).

his machines located in that County, but that he now was "out of the loop" because Buncombe County "just changed sheriff's [sic]." Henderson stated that the sheriff "that was there" was a "super guy," and that Henderson hated to see him lose the election. Henderson also stated that Medford had been "happy" with receiving from Henderson Amusement between $2,000 and $3,000 each month, plus "a lot more at election time."[5] Henderson mentioned Medford by name at least three times during the recorded conversation.

The government sought to introduce this recorded evidence as proof that Henderson Amusement engaged in a conspiracy to conduct an illegal gambling business with Medford and his co-conspirators, as alleged in Count Eleven of the indictment. The government also asserted that the recording tended to prove the existence of an illegal gambling business operated by Henderson Amusement across multiple counties in North Carolina, including Buncombe County.

The district court found by a preponderance of the evidence that Medford was a part of a conspiracy with Henderson Amusement operating both inside and beyond Buncombe County. The court ruled that, therefore, the recording made at the December 19 meeting was admissible under Rule 801(d)(2)(E) as containing statements made by co-conspirators in furtherance of that conspiracy. *See* Fed. R. Evid. 801(d)(2)(E).

A district court's evidentiary ruling ordinarily is reviewed on appeal under an abuse of discretion standard. *United States v. Murray*, 65 F.3d 1161, 1170 (4th Cir. 1995). Under this standard, the appellate court affords the evidentiary ruling substantial deference, and will not overturn the ruling unless the decision was "arbitrary and irrational." *See id.*; *United States v. Weaver*, 282 F.3d 302, 313 (4th Cir. 2002).

---

[5]There is no evidence in the record that Henderson had met Medford, or ever had participated in a direct conversation with him.

Based on the present record, however, we need not resolve the question whether the recording at issue was admissible under Rule 801(d)(2)(E). Instead, assuming, without deciding, that the district court erred, we conclude that any such error was harmless.

Under Rule 52 of the Federal Rules of Criminal Procedure, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." We employ a well-established analysis in determining whether a particular trial error was harmless. As we have explained:

> In order for an error to have a substantial and injurious effect or influence, it must have affected the verdict. Because juries have a limited number of responses to give in a criminal trial – guilty, innocent, or cannot decide – an error is harmless when the error did not substantially sway or substantially influence the response.

> Thus, if the evidence is not merely sufficient, but so powerful, overwhelming, or cumulative that the error simply could not reasonably be said to have substantially swayed the jury's judgment, then the error is not harmful. On the other hand, if the federal court is in grave doubt about whether the trial error had a substantial and injurious effect or influence on the verdict and therefore finds itself in virtual equipoise about the issue, the error is not harmless. And the determination of whether trial error substantially and injuriously affected the judgment must be made by the court based on its review of the record.

*Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (en banc) (citations and internal quotation marks omitted).

Upon our review of the record, and as described below, we conclude that apart from Jamie Henderson's statements at the

December 19 meeting, there was overwhelming evidence concerning Medford's agreement and participation with Henderson Amusement in operating an illegal gambling conspiracy.[6] The government presented testimony from Pennington, and expense reports related to Henderson Amusement's operation in Buncombe County, which established that Pennington regularly made cash payments to Medford on behalf of Henderson Amusement. Pennington testified that his cash payments to Medford became so regular that Pennington knew that if Medford asked to see him, "it was time to bring some money."

Henderson Amusement's expense reports, which the government introduced into evidence at trial, reflected that Medford received $32,000 in cash from Henderson Amusement during the time frame that Pennington was registering video poker machines with the Buncombe County Sheriff's Department and placing those machines at stores in Buncombe County. In light of this direct evidence that Henderson Amusement made cash payments to Medford, Jamie Henderson's statement from the December 19 meeting that Medford regularly received cash payments from Henderson Amusement was merely cumulative of evidence already before the jury.

The government also introduced the testimony of several video poker machine operators and store owners who attested to providing cash bribes to Medford. These witnesses stated that such bribes were necessary for them to be able to operate video poker machines providing illegal cash pay-outs without fear of prosecution. Further, Harrison, who worked for Med-

---

[6]We observe that to obtain a conviction under Count Eleven, the government was not required to prove that the gambling conspiracy extended outside Buncombe County. The government's argument that the conspiracy involving Medford encompassed several North Carolina counties primarily addressed the admissibility of the statements made during the December 19 meeting under Rule 801(d)(2)(E).

ford during a substantial period of the conspiracy, testified that Medford requested and accepted cash payments from video poker machine operators on numerous occasions.

In light of this overwhelming evidence supporting the jury's verdict, we reach a firm conclusion that the district court's admission of the December 19 recording "could not reasonably be said to have substantially swayed the jury's judgment."[7] *Cooper*, 103 F.3d at 370. Accordingly, we hold that even if the district court erred in admitting into evidence the recording of the December 19 meeting, such error was harmless.

### B.

Medford next argues that the district court deprived him of due process by denying his motion to sever his trial from that of his co-defendant, Penland.[8] Medford contends that the district court's denial of the motion prevented him from introducing Penland's exculpatory statements made to the FBI while cooperating with the government's investigation. Medford asserts that Penland would have provided this evidence at Medford's trial if the two trials had been severed.

According to Medford, Penland told the FBI that he had not collected money from persons on Medford's behalf, nor had Penland observed Medford engaging in any wrongdoing. Medford asserts that Penland also told the FBI that when he gave Medford cash received from Pennington and Medford asked the reason for the payment, Penland told Medford that the cash "was a donation and [Pennington] didn't care what Medford did with it."

---

[7]We note that Medford did not respond to the government's harmless error argument, in which the government cited in detail numerous examples of testimony implicating Medford in the conspiracy.

[8]Medford filed the motion to sever, and Penland later filed a pleading joining Medford's motion.

After being presented with the motion to sever, the district court ordered Medford and Penland to file an "assurance that defendant Penland will testify should the defendants' motion be granted and the trial severed." In response to the district court's order, Penland filed a written representation stating, in relevant part, that "Penland can provide assurance to the Court that he intends to cooperate with any Subpoena issued by Bobby Lee Medford . . . ." However, Penland's response also stated that "[o]bviously, facts and circumstances which may arise during a trial of [Medford], or, for that matter, a *previous trial* of [Penland], could alter the landscape sufficiently to cause him, in [good] faith, *to retract his position* stated herein . . . ." (Emphasis added).

The district court reviewed Penland's representation and concluded that "Penland's willingness to testify at a severed trial of defendant Medford appears to be conditioned on Penland being tried first." The district court held that Penland's representation did not demonstrate an unequivocal willingness to waive his Fifth Amendment rights and testify at a severed trial regardless which trial began first, as required under Fourth Circuit precedent. Accordingly, the district court denied the defendants' motion to sever.

We review the district court's denial of the motion to sever for an abuse of discretion, recognizing that there is a presumption in favor of joint trials in cases in which defendants have been indicted together. *United States v. Rusher*, 966 F.2d 868, 877-78 (4th Cir. 1992); *United States v. Brooks*, 957 F.2d 1138, 1145 (4th Cir. 1992); *United States v. West*, 877 F.2d 281, 287-88 (4th Cir. 1989). Under our circuit precedent, in cases in which the motion to sever is based on an asserted need for a co-defendant's testimony, the moving defendant must establish the following four factors:

(1) a bona fide need for the testimony of his co-defendant;

(2) the likelihood that the co-defendant would testify at a second trial and waive his Fifth Amendment privilege;

(3) the substance of his co-defendant's testimony; and

(4) the exculpatory nature and effect of such testimony.

*United States v. Parodi*, 703 F.2d 768, 779 (4th Cir. 1983).

In explaining the second factor in *Parodi*, on which the district court based its ruling, we emphasized that this requirement is not satisfied if the co-defendant's offer to testify is "conditioned on [that] co-defendant's case being tried first." *Id.* In the present case, the district court's finding that Penland's willingness to testify at a severed trial of defendant Medford appeared to be conditioned on Penland being tried first is a reasonable interpretation of Penland's representation. Moreover, Penland's representation was, at best, equivocal regarding his willingness to waive his Fifth Amendment rights if the trials were severed. Accordingly, we conclude that the district court did not err in determining that Medford failed to satisfy the second *Parodi* factor.

Medford additionally contends, however, that the district court erroneously concentrated solely on the second *Parodi* factor, to the exclusion of the other three factors. We find no merit in this argument.

In *Parodi*, we held that a defendant "must establish" the four listed factors. We did not state that all the listed factors must be "weighed," nor did we use any other term suggesting that the factors comprised a balancing test. Moreover, we used the conjunctive term "and" when listing the four factors, signifying that those factors were requirements that all must be satisfied. Thus, a defendant seeking to sever his trial from

a co-defendant's trial based on the asserted need for a co-defendant's testimony must satisfy all four requirements articulated in *Parodi*. The district court, upon concluding that the second *Parodi* factor had not been satisfied, therefore was not required to examine the remaining factors in conducting its *Parodi* analysis. Accordingly, we conclude that the district court did not abuse its discretion in denying Medford's motion to sever.

C.

Medford next challenges his conviction for conspiracy to commit extortion under the Hobbs Act, 18 U.S.C. § 1951, contending that the evidence was insufficient to support this conviction. He argues that the Hobbs Act requires proof that the co-conspirators agreed to extort property from a person not a part of the conspiracy, but that the persons and entities from whom money was extorted in this case were all Medford's co-conspirators. We disagree with Medford's analysis.

Initially, we observe that Medford did not assert this argument in the district court. Therefore, we review the claim under the "plain error" standard of review. *See Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (issues raised for first time on appeal will not be considered absent a showing of plain error).

Medford's argument is based on the Hobbs Act's definition of "extortion," which describes "the obtaining of property *from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). Medford's argument, however, suffers from a false premise, namely, that all the persons and entities from whom Medford and his co-conspirators obtained property were parties to the conspiracy.

Contrary to Medford's contention, the video poker machine operators and store owners were not co-conspirators with

respect to the Hobbs Act charge. The Hobbs Act conspiracy charge was stated in a manner manifesting that the video poker machine operators and store owners were not members of that conspiracy. Accordingly, we conclude under the plain error standard of review that the evidence was sufficient to support Medford's conspiracy conviction for "the obtaining of property of another" by conduct and under circumstances proscribed in the Hobbs Act. *See id.*

### D.

Medford next contends that he suffered prejudice resulting from the alleged inconsistent and biased treatment he received from the district court. Medford asserts that the district court frequently criticized his defense counsel in the jury's presence, and repeatedly questioned various defense witnesses and "hurried along" their testimony given on direct examination. Additionally, Medford contends that the district court imposed more stringent requirements on the defense than on the government regarding certain procedural issues, including information concerning the identification of witnesses expected to testify at trial.

Because Medford's claim of judicial bias raises a due process challenge, we conduct a "plenary review" of the record. *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 178 n.12 (4th Cir. 2002). In our examination of the record, we remain mindful of the fact that there is a difference between a "fair" trial and a "perfect" trial. *See Parodi*, 703 F.2d at 776. Upon our review, we conclude that the district court did not exhibit unfair treatment or bias toward Medford. Therefore, we reject Medford's argument that his conviction was tainted by judicial bias.

### E.

Finally, Medford argues that we should reverse his convictions on the Honest Services Fraud charges (Counts Three

through Seven) because, in his view, the Honest Services Fraud statute, 18 U.S.C. § 1346, is unconstitutionally vague. In support of his position, Medford relies exclusively on Justice Scalia's concurring opinion in *Skilling v. United States*, 130 S. Ct. 2896, 2935-41 (2010).

Although we ordinarily review issues of statutory construction de novo, *United States v. Linney*, 134 F.3d 274, 282 (4th Cir. 1998), we observe that Medford's position is foreclosed by the Supreme Court's majority opinion in *Skilling*. In contrast to Justice Scalia's view, which also was joined by Justice Thomas and Justice Kennedy, the Court's majority opinion, joined by six Justices, held that the Honest Services Fraud statute was not unconstitutionally vague with respect to its provisions addressing "bribery or kickback schemes," the provisions on which the charges against Medford were based. *See Skilling*, 130 S. Ct. at 2930-31. Accordingly, we reject Medford's argument that the Honest Services Fraud statute is unconstitutionally vague, and we affirm his convictions for violating that statute.[9]

### III.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*

---

[9]Based on our holding, we need not address the government's argument that the plain error standard of review applies to Medford's vagueness argument because he did not raise that argument in the district court.