**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-4301**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

FREDDIE WIGENTON, a/k/a Lil D,

        Defendant - Appellant.

**No. 11-4302**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

DESHAWN ANDERSON, a/k/a Buddha,

        Defendant - Appellant.

**No. 11-4303**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

MARVIN WAYNE WILLIAMS, JR.,

        Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:09-cr-00414-JCC-1, 1:09-cr-00414-JCC-2, 1:09-cr-00414-JCC-3)

———————————

Submitted: June 15, 2012          Decided: August 3, 2012

———————————

Before TRAXLER, Chief Judge, NIEMEYER and KING, Circuit Judges.

———————————

Affirmed by unpublished per curiam opinion.

———————————

Paul P. Vangellow, PAUL P. VANGELLOW, PC, Falls Church, Virginia, for Appellant Deshawn Anderson; Alan H. Yamamoto, Alexandria, Virginia, for Appellant Freddie Wigenton; Matthew A. Wartel, Alexandria, Virginia, for Appellant Marvin Wayne Williams, Jr.; Neil H. MacBride, United States Attorney, Michael P. Ben'Ary, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Freddie Wigenton, Deshawn Anderson, and Marvin Wayne Williams, Jr. (collectively, "Appellants") appeal their convictions and sentences arising out of a drug conspiracy and drug-related killing. Finding no error, we affirm.

I.

As is relevant to this appeal, the evidence presented at trial, viewed in the light most favorable to the government, is as follows. Starting in approximately 2005, Williams was the source of crack cocaine, powder cocaine, marijuana, and PCP for a drug distribution business he operated with Annette Sprow. Sprow sold hundreds of ounces of crack during the conspiracy. Wigenton and Anderson would both purchase "eight-ball" quantities of crack from Sprow (roughly 3.5 grams), divide them into smaller quantities, and resell them.

During the conspiracy, two men robbed Sprow at gunpoint in her apartment, from which she and Williams sold drugs. The robbers stole a .38-caliber pistol, a vehicle, and some drugs that were inside the vehicle. Sprow believed she recognized one of the men, but the other man's face was covered with a bandana. When Williams learned of the robbery, he was very upset. He suspected that a man named Kyle Turner was involved. Turner and Williams had had a dispute a few weeks

3

earlier, and Sprow told Williams that she had seen Turner wearing the same hat as the robber whose face had been covered. Williams stated that he would "take . . . out" the robbers if he found them.  J.A. 933.

A "couple of days" after the robbery, Turner asked Sprow, who was in front of her apartment building, if he could buy a "dipper," which is a cigarette dipped in PCP.  J.A. 480. Sprow loudly told Turner that she was not selling PCP at that time.  Williams, who was nearby, called Sprow over to find out what Turner had said to her.  Sprow then returned upstairs to her apartment with a friend, Rashourn Niles.

Shortly thereafter, Reginald Moten walked through the parking lot behind Sprow's building with Turner and one other person.  Moten saw the Appellants standing in the front corner of the parking lot; they were the only other people he saw in the area.  As Moten left the lot and walked toward the front of Sprow's building, he heard gunshots and saw flashes.  He quickly fled.

Sprow and Niles also heard the shots from Sprow's third-floor apartment.  Niles looked out of the window and saw Anderson and Wigenton shooting at Turner, who was lying on the ground in the parking lot.  Seconds later, all three Appellants ran into the apartment along with a fourth person.  Sprow

4

noticed that the three Appellants had guns, and she heard Anderson ask Wigenton for more bullets.

Williams ordered Sprow to drive the other three men home, and he gave her his gun so that she could get it away from the apartment. During the short ride, Sprow heard Anderson ask Wigenton if he saw "how that MFer's body shook when he hit the ground." J.A. 490.

When Sprow returned to her apartment, Williams told her that he had seen Turner in the parking lot, and that when Williams overheard Turner say Sprow's name, Williams "just started shooting." J.A. 490. Also shortly after the shooting, Anderson, with Wigenton present, told Jeremiah Jackson that Anderson and two other individuals had just shot someone who had robbed Sprow. Anderson reported that he had used a .40-caliber firearm and that the other two individuals had used .45-caliber and .38-caliber firearms.

In the next few days, Anderson also told Anthony Hogan, a former football teammate, that Anderson "had shot a dude" and "unloaded his .40-caliber." J.A. 1018, 1021. Anderson again reported that two other individuals had participated in the shooting, one using a .45-caliber firearm and the other, a .38-caliber. Anderson also gave a similar account to Jerome Waters. Anderson told Waters that the

5

individual with the .38-caliber weapon had fired "a couple of times" before the weapon jammed. J.A. 944.

Wigenton also told Waters that authorities were trying to charge him with the killing but that he had thrown his weapon into the water. Wigenton also discussed his participation in the shooting with Jackson, telling him that "they got to shooting at somebody" and that Wigenton had later disposed of the guns by "[t]hr[owing] them off [a] bridge or something." J.A. 875.

The physical evidence collected from the scene was consistent with Appellants' accounts of the killing. Manassas City Police collected several .45-caliber shell casings from the area at the front corner of the parking lot. They also found an unspent .38-caliber round, a .38-caliber shell casing, and ten .40-caliber casings in the lot.

Turner's autopsy revealed 13 gunshot wounds, and .45-caliber, .38-caliber, and .40-caliber bullets were all recovered from Turner's body. The medical examiner concluded that Turner's death was caused by multiple gunshot wounds and that lethal or potentially lethal wounds were attributable to ammunition of each caliber.

Following an investigation, the government filed two single-count Juvenile Informations, one charging Anderson and one charging Wigenton with the intentional killing of Turner

6

during the course of a drug conspiracy, in violation of 21 U.S.C.A. § 848(e)(1)(A) (West 1999) and 18 U.S.C.A. § 2 (West 2000), if they had been adults. The government also filed Certifications To Proceed Under the Juvenile Justice and Delinquency Prevention Act, see 18 U.S.C.A. § 5031, et seq. (West 2000 & Supp. 2012). The government later successfully moved to transfer both juveniles to adult prosecution.

In December 2009, a federal grand jury returned a three-count superseding indictment charging Appellants with conspiracy to distribute crack cocaine (Count One), intentional killing while engaged in drug trafficking (Count Two), and use of a firearm in connection with conspiracy to distribute crack cocaine resulting in death (Count Three). Each Appellant pleaded not guilty.

Each Appellant filed a pre-trial motion seeking to have his case severed from that of his co-defendants, or for suppression of his co-defendants' out-of-court statements. The district court granted the motions to suppress the statements, ruling that "the Government will be allowed to offer the statements of each defendant only against the declarant, and not against the other two co-defendants." J.A. 138.

The case then proceeded to trial by jury. The jury returned guilty verdicts for each Appellant on Counts One and Three and a verdict of not guilty for each on Count Two.

7

Appellants filed various post-trial motions, which the district court denied. Each Appellant received sentences of 25 years on Count One and 25 years on Count Three, to run consecutively.

## II.

Appellants first argue that the evidence was insufficient to support their convictions on Count One. We disagree.

Sprow's testimony about the conspiracy in general and Appellants' respective roles in it was sufficient by itself to sustain the verdict, and her testimony was also corroborated by other witnesses. Appellants argue that in light of the significant evidence casting doubt upon the credibility of the government's witnesses – Sprow, in particular – the evidence supporting Appellants' guilt on Count One was not sufficient. However, the question of a witness's credibility is one for the jury to decide. See United States v. Shipp, 409 F.2d 33, 36 (4th Cir. 1969).

Appellants also argue with regard to Anderson specifically that even though Sprow testified she sold drugs to him, there is no evidence that he redistributed those drugs. That claim is refuted by the record. When asked what Anderson would sell, Sprow answered "[c]rack." J.A. 469. She testified

8

he was buying the crack from her "[m]aybe once a week" in "[e]ight-ball" quantities.[1]  J.A. 470.

Appellants also contend that there was no evidence that it was reasonably foreseeable to Anderson that the quantity of crack cocaine allegedly distributed in the conspiracy was 50 grams or more.  However, a reasonable jury could easily conclude that the scope of the conspiracy was reasonably foreseeable to Anderson.  Sprow testified that Anderson was himself purchasing eight-balls of crack, which are approximately 3.5 grams each. And, his involvement in the conspirators' retribution for the robbery of the stash house tended to show his awareness that the operation was significantly larger than the sales he was making.

## III.

Appellants next challenge the sufficiency of the evidence on Count Three, which charged that Appellants used firearms to murder Turner during and in relation to their drug distribution conspiracy.  We find this challenge to be without merit.

The government presented testimony that Williams had a prior disagreement with Turner and that Williams told Sprow and

---

[1]  Although Appellants contend that this evidence was hearsay, it was evidence of Anderson's actions, not evidence of what anyone said.

9

others that he would "take care of" the person responsible for the robbery, who Williams and Sprow believed to be Turner. J.A. 480; see also J.A. 933 (testimony that Williams said he would "take . . . out" the robbers). Additionally, Niles testified that when he looked out of Sprow's window, he saw Anderson and Wigenton shooting Turner. Both Sprow and Niles testified that moments after the shooting, all three Appellants ran into the apartment. Sprow saw that all three had guns, and Niles also noticed that Anderson was holding a gun. Additionally, the Appellants' own statements to others implicated them in Turner's murder, and their statements were consistent with the physical and forensic evidence presented at trial.

IV.

Appellants also maintain that the district court erred in concluding that the jury, in finding them each guilty on Count Three, found them guilty of violating 18 U.S.C.A. § 924(j) (West Supp. 2012), as opposed to 18 U.S.C.A. § 924(c) (West Supp. 2012). Appellants argue that while both subsections require proof of a use or carrying of firearms during and in relation to a drug trafficking crime, § 924(j) also requires proof of a resulting death. Appellants contend that the jury was never instructed that to find Appellants guilty of Count Three, it would have to find that they used firearms to kill

10

Turner. That contention, however, is incorrect.[2] The court charged that to establish the first element of the crime alleged in Count Three, the government would need to show that the defendants "committed the crime of using a firearm in connection with the conspiracy to distribute crack cocaine <u>resulting in death as identified in counts one, two, and three of the superseding indictment</u>." J.A. 1408 (emphasis added). The district court read each of the three counts to the jury. Counts Two and Three both alleged that the Appellants used firearms to kill Turner. No other death was referenced in the indictment.


V.

Appellants next argue that the district court erred in transferring Wigenton and Anderson to adult prosecution. We review a district court's ultimate decision to transfer a juvenile to adult status for abuse of discretion, reviewing the

---

[2] Because we conclude that the jury was instructed that it must find that Appellants used firearms to kill Turner in order to find Appellants guilty of Count Three, we also reject Appellants' arguments that the indictment was constructively amended and that the district court relied on acquitted conduct in holding Appellants responsible for Turner's murder at sentencing. Additionally, as to the acquitted-conduct argument, it is well established that in determining an appropriate sentence, a district court may consider conduct for which the jury returned a not-guilty verdict. <u>See</u> <u>United States v. Grubbs</u>, 585 F.3d 793, 798-99 (4th Cir. 2009).

underlying factual findings for clear error.  See United States v. Robinson, 404 F.3d 850, 858 (4th Cir. 2005).  We find no abuse of discretion with regard to either Appellant.

In determining whether to transfer a juvenile to adult status, the district court must consider:  (1) the juvenile's age and social background, (2) the nature of the offense alleged, (3) the extent and nature of the juvenile's prior record of delinquency, (4) the juvenile's current intellectual development and psychological maturity, (5) the nature of past treatment efforts regarding the juvenile and his response thereto, and (6) the availability of programs designed to treat the juvenile's behavioral problems.  See 18 U.S.C.A. § 5032 (West 2000).  Although the court may decide what weight each factor should have, "the nature of the crime clearly predominates."  United States v. Juvenile Male #1, 86 F.3d 1314, 1323 (4th Cir. 1996).

In determining that Wigenton and Anderson should be transferred to adult status, the court concluded with regard to each that five of the six factors weighed in favor of transfer and that the factor of intellectual development and maturity was neutral.  At the time of the offense, Wigenton was 17 and Anderson just fourteen days short of 17.  The court found that both had had family support and neither had been abused or neglected.  The court further determined that an intentional

12

killing during a conspiracy to distribute crack is a serious crime. The court also noted the Appellants' extensive juvenile criminal histories. Wigenton's criminal record showed that he had twice been convicted as an adult in Virginia courts. Similarly, Anderson had twice been convicted as an adult for malicious wounding. Although the court determined that both had performed poorly academically, it found that they possessed the cognitive ability to conform their actions to the law. The court determined that the numerous opportunities for treatment the two had received had not prevented them from continuing to commit criminal offenses. Finally, the court concluded that in light of the Appellants' ages and extensive criminal histories, no programs were available to treat their behavioral problems. In our view, the court's reasoning was sound, and the court was well within its discretion with regard to each Appellant.

## VI.

Appellants also contend that the district court erred in denying their severance motions. We disagree.

We review a district court's denial of a severance motion for abuse of discretion. See United States v. Medford, 661 F.3d 746, 753 (4th Cir. 2011). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537

(1993).  Severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment against guilt or innocence."  Id. at 539.

Here, Appellants maintain that severance was required to protect their Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2004), and Bruton v. United States, 391 U.S. 123 (1968), regarding their co-defendants' out-of-court admissions.  That is not the case, however.

Crawford establishes that the Confrontation Clause prohibits the admission of testimonial hearsay statements against a criminal defendant unless that defendant has the opportunity to cross-examine the declarant.  See 541 U.S. at 53-54.  A statement is testimonial if it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 52 (internal quotation marks omitted). The statements at issue here, however, were made to non-law enforcement witnesses and were not in anticipation of trial.

Additionally, even assuming that non-testimonial statements of co-defendants can create a Bruton problem after Crawford, the admission of the statements by the co-defendants did not violate Bruton because the statements made no mention of the names of anyone else involved nor provided a

14

means of identifying them. See United States v. Najjar, 300 F.3d 466, 475 (4th Cir. 2002) ("A Bruton problem exists only where a co-defendant's statement on its face implicates the defendant."). Furthermore, the district court charged the jury that each defendant's statements were to be considered with regard only to the guilt of the defendant who made the statement. See Richardson v. Marsh, 481 U.S. 200, 211 (1987) (holding that redaction of co-defendant's confession, in conjunction with proper limiting instruction, prevented Bruton violation).

VII.

Appellants next maintain that, as a matter of law, the jury's not-guilty verdict on Count Two precluded conviction on Count Three. That is incorrect. It is well established that "inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdicts." United States v. Green, 599 F.3d 360, 369 (4th Cir. 2010). Although Appellants cite the doctrine of collateral estoppel as support for their position, that doctrine applies only when a factual issue has been determined by a valid and final judgment in a prior action between the same parties. See Ashe v. Swenson, 397 U.S. 436, 443 (1970). It

does not apply to inconsistent jury verdicts in a single trial. See United States v. Powell, 469 U.S. 57, 68 (1984).

## VIII.

Appellants also argue that the district court erred in refusing to give the jury a special verdict form offered to the court by Anderson. We review a district court's refusal to submit a special verdict form requested by a defendant for abuse of discretion. See United States v. Udeozor, 515 F.3d 260, 270-71 (4th Cir. 2008). We find no abuse here.

Although Anderson's special verdict form is not included in the joint appendix, it appears from the record that the form indicated that if the jury found a defendant not guilty on some accounts, it was required to find him not guilty on others. Appellants maintain that the district court's refusal to use this form "prevented the court from correctly analyzing the Count 2 acquittal's effect as a predicate offense on the Count 3 conviction." Appellants' brief at 66. As we have explained, however, a jury's verdict on one count does not have a preclusive effect on any other count. The district court was therefore well within its discretion in refusing to employ Anderson's form and in having the jury consider the counts separately.

16

IX.

Appellants also contend that the district court erred in admitting grand jury testimony as prior consistent statements. We review for abuse of discretion a district court's decision to admit evidence. See United States v. Lighty, 616 F.3d 321, 351 (4th Cir. 2010). We discern no abuse of discretion here. When an adverse party uses cross-examination to point out apparent inconsistencies between a witness's grand jury testimony and his trial testimony, as happened in this case, the "doctrine of completeness" permits the government to attempt to rehabilitate the witness through use of other portions of the grand jury testimony consistent with the witness's trial testimony to the extent necessary to prevent "misunderstanding or distortion." United States v. Hedgepeth, 418 F.3d 411, 422 (4th Cir. 2005) (internal quotation marks omitted).

X.

Appellants next argue that the district court erred in denying their motion to vacate the guilty verdicts on Counts One and Three because of the government's failure to timely disclose approximately 70 pages of Bureau of Alcohol, Tobacco, Firearms

17

and Explosives reports. The decision of a district court regarding what sanction, if any, to impose for a discovery violation, is reviewed for abuse of discretion. See United States v. Hastings, 126 F.3d 310, 316 (4th Cir. 1997). We conclude that the district court was well within its discretion in denying Appellants' motion.

In so doing, the district court observed that the pages at issue were made available for review 11 days prior to trial and that Appellants had adequate time to review them before trial. Additionally, the court noted that it was represented to the court that Williams' attorney actually did review them at the United States Attorney's Office and that defense counsel had divided document reviewing responsibilities and shared the information they obtained from their reviews. The court added that although Appellants contend that the pages were Brady material, see Brady v. Maryland, 373 U.S. 83 (1963), they did "not even approach the level of materiality necessary for Brady to be implicated." J.A. 1563. On appeal, the Appellants offer no significant challenge to any of the district court's analysis.


XI.

In sum, finding no error, we affirm the Appellants' convictions and sentences. We dispense with oral argument

18

because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid in the decisional process.

AFFIRMED