**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4054**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

BRUCE DWAYNE WINSTON,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, District Judge. (1:13-cr-00639-RDB-2)

Argued: May 10, 2016                    Decided:  June 10, 2016

Before SHEDD, DUNCAN, and KEENAN, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Shedd and Judge Keenan joined.

**ARGUED:** Christopher Alan Suarez, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant. Peter Jeffrey Martinez, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Joanna Beth Silver, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland; F. Lane Heard III, WILLIAMS & CONNOLLY LLP, Washington, D.C., for Appellant. Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

On June 3, 2013, the Maryland State Police stopped Appellant Bruce Winston and discovered 21 kilograms of cocaine and $30,000 in cash hidden in a compartment in his truck. A jury convicted Winston of possessing cocaine with intent to distribute, and conspiring to do the same, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. On appeal, Winston challenges the district court's denial of his motion to suppress the evidence discovered in his truck. He also contends that the district court erred in admitting evidence, under Federal Rule of Evidence 404(b), that connected Winston to drugs seized by law enforcement in North Carolina in 2010. Because the Maryland State Police had reasonable suspicion to stop Winston under the collective knowledge doctrine, and because the admission of the North Carolina evidence was harmless, we affirm.

I.

A.

We begin by providing background on the investigation that led to the arrest of Jorge Herevia, Joe Payne, and Bruce Winston--all three of whom were indicted as co-conspirators in a cocaine distribution ring.

The investigation began with information from a cooperating defendant, Dewon Nelson. In January 2013, Drug Enforcement

2

Agency ("DEA") agents arrested Nelson in Delaware for possession of cocaine. During subsequent proffer interviews, Nelson told DEA agents that his supplier was Juan Carlos Flores, who operated in Texas. According to Nelson, Flores hired men to drive cocaine to Delaware in vehicles with hidden compartments. The scheme was coordinated by one of Flores's associates, identified as "George," who would travel from Texas to Delaware to oversee the transactions, during which he would drive a "white utility style truck with an Entergy label on the side of it that contained a secret compartment where they would keep the cocaine." J.A. 103-04.

Nelson explained that one of the men who purchased cocaine from Flores and "George" was an individual named "Tone." Tone was "a light-skinned black male from the Baltimore area that would drive to Delaware, meet with Flore[s], George, and Mr. Nelson, and retrieve kilos of cocaine." J.A. 104. Tone drove "an older model Honda Odyssey." J.A. 105. Nelson further identified several dates in September and October 2012 on which "George" stayed at the Holiday Inn in Delaware to coordinate these cocaine transactions.

Using hotel records from the dates Nelson provided, DEA agents identified "George" as Jorge Herevia from Alton, Texas. In May 2013, the DEA learned that Herevia had checked into a Holiday Inn in Baltimore, Maryland, using the same credit card

3

he had used in Delaware. DEA agents promptly began surveillance of the hotel.

The DEA monitored Herevia in Baltimore from May 30 to June 3, 2013. The first day passed without event. However, on the second day of the surveillance, agents observed Herevia meet with an individual who matched Nelson's description of Tone, the Baltimore-based drug dealer. This individual was driving a Honda Odyssey, the same type of car that Nelson said Tone drove.

Two days later, the DEA observed Appellant Winston arrive at the Holiday Inn where Herevia was staying. Winston was traveling with a man later identified as Joe Payne, and they arrived at the hotel driving "a utility style truck with the word Shale Entergy, that emblem on the side of the truck."[1] J.A. 115. Later that evening, after Payne and Winston had checked into the hotel, DEA agents observed Payne, Winston, and Herevia at the hotel bar. An undercover detective approached the three men, joined them for a drink, and later accompanied the group to a bar across the street, where they socialized for several hours before returning to the hotel. On more than one

---

[1] At the suppression hearing, a DEA agent explained that "cartels have been more recently using vehicles . . . like even mail trucks, UPS trucks, and specifically oil trucks to conceal their true intent of smuggling drugs and money. And they feel that law enforcement will be less likely to pull these vehicles over if it looks as if they have a purpose." J.A. 138.

occasion that evening, Herevia bragged to the undercover detective that he had a large amount of cash with him.

The next morning, Herevia drove the Shale Entergy truck to a Wal-Mart store, where he purchased a heat sealer. This was significant to the DEA because, as one DEA agent explained, "[d]rug traffickers often use heat sealers to compact drugs and drug money. It's also used as a way to lessen the amount of odor that can emanate from drugs." J.A. 118. The DEA agents, however, lost track of Herevia for a period of time between his purchase of the heat sealer and his return to the hotel. Within fifteen minutes of Herevia's return, Winston and Payne came out of the hotel with their luggage and drove off in the Shale Entergy truck wearing shirts bearing "Shale Entergy" logos. Herevia remained at the hotel.

At this point, the DEA agents believed that the truck likely contained drugs and drug money, and they directed the Maryland State Police to stop the truck as it traveled on the highway out of Baltimore. The DEA's purpose behind directing a marked, local law enforcement unit to conduct the stop was twofold: first, it was safer than using an undercover vehicle to stop suspected drug traffickers, and second, the Maryland State Police could stop the car without alerting the suspects that they were part of a federal investigation.

5

Shortly after state police officers stopped the truck, a canine team detected the odor of narcotics emanating from the truck bed. A subsequent search of the truck uncovered $30,000 in cash and 21 kilograms of cocaine within a hidden compartment in the truck bed. The truck was registered to Winston.

B.

A federal grand jury indicted Winston, Payne, and Herevia on two counts: conspiring to possess and distribute over five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and possessing five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Herevia pleaded guilty on May 1, 2014, and Payne and Winston proceeded to trial.

In addition to filing other pre-trial motions, Winston moved to suppress the evidence seized from his truck, arguing that the stop was not supported by reasonable suspicion. The government opposed the motion and filed a motion in limine, seeking to admit trial evidence related to a 2010 incident under Federal Rule of Evidence 404(b). In that incident, an employee on Winston's farm was stopped in North Carolina driving a horse trailer with $1.1 million in cash and over a half-ton of

6

marijuana hidden in a secret compartment.  The trailer was registered to Winston.[2]

The district court held hearings on the motions and issued a written opinion on September 23, 2014, denying Winston's suppression motion and granting the government's motion in limine.

C.

Winston and Payne were jointly tried in October 2014.  The primary issue at trial was whether Winston was a knowing and active participant in the conspiracy.

At trial, the government introduced as evidence the cocaine and money seized from Winston's car, and the jury heard testimony about the 2010 incident in North Carolina.  The focus of the government's case, however, was the testimony of Herevia, who detailed Winston's involvement in the cocaine distribution conspiracy.  According to Herevia, Winston was a drug courier for Flores, and it was Winston's idea to install a secret compartment in his pickup truck to avoid detection by law enforcement.  Herevia testified that, in the spring of 2012, he traveled with Flores to Winston's farm in Arkansas and installed the compartment.  Flores and Herevia performed the installation

_____

[2] Winston himself was not present during this incident.  He later retrieved the vehicle from the police, but he was not charged with any crimes.

7

work in Winston's shed, welding a box underneath the truck bed to make the compartment. Winston assisted them by maneuvering the truck with his tractor to provide access to the underside of the bed.[3] Herevia testified that Winston and Payne used the modified truck on multiple occasions to transport drug shipments to Delaware and Maryland for Flores. Herevia's role in the conspiracy was to unload the truck and deliver the drugs at the point of sale.

Winston testified that he was an unknowing participant in the scheme, and that he believed he had been taking trips to Delaware and Baltimore to work for a legitimate company, "Shale Entergy." Winston testified that he was a company employee, that he reported to Herevia, and that he drove his truck--bearing Shale Entergy's logo--to job sites for the company. But Winston ultimately conceded that the company did not exist, and Herevia told the jury that neither he nor Winston ever worked for Shale Entergy. And Herevia further testified that it was Winston's idea to put the Shale Entergy logo on his truck and wear logo-bearing shirts to appear less suspicious to law enforcement.

---

[3] Winston himself testified that he helped Herevia install a new bed on his truck. However, he claimed that Herevia told him they were installing a new bed with tool compartments. Winston denied seeing a trap door or secret compartment in the new truck bed when he installed it.

8

The jury also heard about incriminating statements Winston made during a post-arrest interview with several DEA agents and two officers from the Maryland State Police. When asked about his activities leading up to his arrest, Winston told the officers that he had traveled to a Shale Entergy job site in New Holland, Pennsylvania, but he was turned away due to rain and returned to Baltimore. To demonstrate that this statement was false, the government introduced weather reports and cell-site location data from Winston's phone, showing that Winston never went to New Holland, and that it had not rained there over the weekend. Special Agent Fitzpatrick of the DEA further testified that, during this interview, he confronted Winston about his account of events, telling him that his story "didn't make any sense, and that he wasn't telling [the DEA] the truth." J.A. 818. Winston eventually conceded: "I don't believe my own story." J.A. 819.

At the conclusion of the trial, the jury returned a verdict acquitting Payne and convicting Winston on both counts. The district court sentenced Winston to 120 months' imprisonment. This timely appeal followed.

II.

On appeal, Winston argues that the district court erred in denying his motion to suppress the evidence discovered in his

9

truck. He also asserts that the district court abused its discretion in admitting evidence relating to the 2010 North Carolina incident. We address each of these contentions below.

A.

Winston challenges the district court's conclusion that the DEA had reasonable suspicion to direct the stop that led to the discovery of the cocaine in his truck.[4] We review the district court's legal conclusions de novo, viewing the evidence in the light most favorable to the government. United States v. Green, 740 F.3d 275, 277 (4th Cir. 2014).

When a police officer stops a vehicle, the stop constitutes a seizure under the Fourth Amendment, which mandates that any seizure be reasonable. U.S. Const. amend. IV; United States v. Digiovanni, 650 F.3d 498, 506 (4th Cir. 2011). The Fourth Amendment permits a police officer to "initiate a brief investigatory stop if the officer has reasonable suspicion to believe that 'criminal activity may be afoot.'" United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). In the context of a suppression motion, the reasonable suspicion standard requires courts to

---

[4] Winston argues only that the initial stop was unconstitutional. He does not claim that the canine sniff or the search of the truck was unlawful. He seeks suppression of the evidence found in the truck only because the search flowed from an allegedly impermissible stop.

10

"view the totality of the circumstances to determine whether the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). However, "reasonable suspicion may exist even if each fact standing alone is susceptible to an innocent explanation." United States v. McCoy, 513 F.3d 405, 413-14 (4th Cir. 2008) (citing United States v. Arvizu, 534 U.S. 266, 277-78 (2002)).

In this case, the Maryland State Police stopped Winston based on instructions from the DEA. Under the collective knowledge doctrine, "[w]hen an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself; in this very limited sense, the instructing officer's knowledge is imputed to the acting officer." United States v. Massenburg, 654 F.3d 480, 492 (4th Cir. 2011). Therefore, the question before us is whether Special Agent Fitzpatrick of the DEA--who led the investigation and directed the stop--had reasonable suspicion to believe that Winston was involved in criminal activity. Given the totality of the circumstances, we conclude that he did.

Here, a team of DEA agents witnessed Winston participating in conduct that closely tracked the patterns of the Flores cocaine trafficking ring, according to information the DEA

11

received from a cooperating defendant. As discussed above, Special Agent Fitzpatrick learned during his investigation that Flores's couriers typically transported drugs in a white truck marked "Entergy," and delivered drugs--with the assistance of Jorge Herevia--to a Baltimore man named Tone. After learning this and tracking down Herevia, a team of DEA agents observed Herevia, Winston, and Payne engage in a suspicious sequence of events. First, Herevia (the suspected drug seller) met with a man matching the description of Tone (the suspected drug purchaser). Then, Winston arrived at Herevia's hotel, driving a white truck marked "Shale Entergy," just like the drug courier's vehicle the informant had described. Next, Herevia took Winston's vehicle on a shopping excursion to buy equipment commonly used in drug trafficking, and he disappeared for a period of time before returning the truck to the hotel. Winston then immediately checked out of the hotel and left in the same vehicle.

Having considered the totality of the circumstances, based on all of the information known to Special Agent Fitzpatrick at the time he directed the stop, we agree with the district court that Special Agent Fitzpatrick reasonably suspected that Winston was carrying drugs and drug money in his truck. See McCoy, 513 F.3d at 414-15 (emphasizing that courts must consider "the totality of the circumstances" when evaluating reasonable

12

suspicion).   Taken together, the facts known to Special Agent Fitzpatrick certainly gave him reasonable suspicion to believe that criminal activity was afoot at the time he directed the stop.   Because the officer who directed the stop had reasonable suspicion, the stop was justified under the collective knowledge doctrine.   Therefore, the stop was fully consistent with the requirements of the Fourth Amendment.

B.

We turn now to Winston's contention that the district court erroneously admitted trial evidence related to the 2010 North Carolina incident under Federal Rule of Evidence 404(b).

"We review evidentiary rulings for an abuse of discretion, affording substantial deference to the district court."  United States v. White, 810 F.3d 212, 227 (4th Cir. 2016) (citing United States v. Medford, 661 F.3d 746, 751 (4th Cir. 2011)). Under Federal Rule of Criminal Procedure 52(a), evidentiary rulings are subject to review for harmless error.   "[I]n order to find a district court's error harmless, we need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'"  United States v. Johnson, 617 F.3d 286, 292 (4th Cir. 2010) (quoting United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997)).

13

At trial, the government presented evidence regarding a 2010 incident, in which North Carolina officials discovered that one of Winston's employees was driving a trailer containing concealed drugs. According to Winston, this evidence was inadmissible character evidence under Rule 404(b), because the incident was unrelated to the conspiracy that was the subject of the trial, and it was factually dissimilar and prejudicial. Assuming without deciding that the district court erred in admitting the evidence, given the strength of the rest of the evidence against Winston at trial, we conclude that any such error was harmless.

The government's case against Winston was powerful, and the evidence of his culpability was overwhelming. The government presented testimony from Winston's co-conspirator, Herevia, that not only implicated Winston as a knowing participant in the cocaine trafficking conspiracy, but also illustrated Winston's active role in concealing the drugs he was transporting at the time of his arrest. Most importantly, the cocaine and money seized from Winston's own truck were admitted as evidence.

The government also demonstrated that Winston's account of events was not credible. Though Winston denied knowing that he was carrying drugs in his truck and claimed he was merely traveling to a work site, the government introduced as evidence Winston's post-arrest statement, in which he conceded: "I don't

14

believe my own story." J.A. 819. The government also introduced cell phone data and weather reports that directly refuted Winston's account of his travels in the days before his arrest. Further still, the government demonstrated that the "legitimate" company Winston claimed to be working for, Shale Entergy, was fictitious.

Winston asserts that the jury's verdict acquitting Payne reveals that the North Carolina evidence--which implicated only Winston--tipped the scales against him. This argument rests upon Winston's assertion that the government's evidence against Winston and Payne was identical except for the North Carolina evidence:

> Although the evidence and arguments against them were identical in nearly every respect, the jury acquitted Mr. Payne and convicted Mr. Winston. It is not hard to understand why. Against Mr. Winston alone, the Government introduced prior "bad acts" evidence that it used to argue that he must have known that the truck in which he and Mr. Payne were riding contained illegal drugs.

Appellant's Br. at 18. But this characterization of the trial ignores significant evidence that implicated only Winston, and not Payne. For example, Herevia testified that Winston was present during the installation of the secret compartment in the truck, and that the secret compartment and the sham Shale Entergy decals were Winston's ideas. And Winston made

15

incriminating statements that were admitted at trial, whereas Payne remained silent post-arrest.

In sum, the evidence at trial showed that Winston was caught with a significant amount of cocaine and cash in a secret compartment built into his own truck. Both tangible evidence and Winston's own statements proved that the version of events he gave to both law enforcement and the jury was false. In light of the overwhelming evidence of Winston's guilt, we conclude that any error the district court may have made in admitting evidence of the North Carolina incident was harmless. We therefore affirm.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

16